**Tyrone WALKER and Walter Diaz, Plaintiffs,**

v.

**Janet RENO, Attorney General of the United States, Defendants.**

No. 3:95–CV–954.

United States District Court, N.D. New York.

Dec. 14, 1995.

Hinman, Howard, Kattell, Binghamton, New York (Albert J. Millus, of counsel), Ruhnke & Barret, West Orange, NJ (David A. Ruhnke, of counsel), for Plaintiff Tyrone Walker.

Peter Orville, P.C., Vestal, New York, Carl J. Herman, Livingston, New Jersey, for Plaintiff Walter Diaz.

United States Dept. of Justice, Civil Division, Washington, DC (Vincent M. Garvey, Jessica A. Lerner, Asst. U.S. Attys., of counsel), for Defendant Janet Reno.

**MEMORANDUM DECISION & ORDER**

McAVOY, Chief Judge.

## I. BACKGROUND

Plaintiffs Tyrone Walker and Walter Diaz seek this Court's review and nullification of defendant Attorney General Janet Reno's decision to seek the death penalty against them.

### A. Facts:

Plaintiffs are currently on trial in this Court on each count of a nine-count superseding indictment filed on September 19, 1994.[1] On May 31, 1995, the government filed Notices of Intent to Seek the Death Penalty against them under 21 U.S.C. § 848(e)(1)(A),[2] if they are convicted of Counts Two or Three of the indictment. The final decision as to whether the government would file Notices of Intention to Seek the Death Penalty was made by defendant Janet Reno, Attorney General of the United States. In this civil action, plaintiffs Tyrone Walker and Walter Diaz claim that defendant Reno acted arbitrarily and capriciously and seek this Court's review under the Administrative Procedure Act, 5 U.S.C. §§ 701–706 ("APA"), of her determination to seek the death penalty against them.

### B. Procedural History:

On July 14, 1995, plaintiffs initiated this civil action. Along with their complaint, plaintiffs simultaneously filed a) a proposed Order to Show Cause seeking an order that the Attorney General immediately produce

1. The indictment charges each defendant under each count as follows:

 **Count One:** engaging in a Continuing Criminal Enterprise, ("CCE") under 21 U.S.C. § 848(a) & (c);
 **Count Two:** CCE–Murder under 21 U.S.C. § 848(e)(1)(A);
 **Count Three:** Narcotics Conspiracy–Murder, under 21 U.S.C. § 841(b)(1)(A), § 848(e)(1)(A) and 18 U.S.C. Section 2;
 **Count Four:** Narcotics Conspiracy under 21 U.S.C. § 841(a)(1);
 **Count Five:** Narcotics Possession with Intent to Distribute under 21 U.S.C. § 841(a)(1) and 18 U.S.C. Section 2;
 **Counts Six & Seven:** Use of a Firearm in Relation to a Crime of Violence and Drug Trafficking Crime, 18 U.S.C. § 924(c)(1) and Section 2;
 **Counts Eight & Nine:** Possession by a felon, in and affecting commerce, of a firearm under 18 U.S.C. § 922(g) and Section 2.

2. This statute states in pertinent part that:
 Any person engaging in or working in furtherance of a Continuing Criminal Enterprise, or any person engaging in an offense punishable under § 841(b)(1)(A) ... who intentionally kills or counsels, commands, induces, procures or causes the intentional killing of an individual and such killing results shall be sentenced to any term of imprisonment, which shall not be less than 20 years, and which may be up to life imprisonment, or may be sentenced to death. 21 U.S.C. § 848(e)(1).

the file upon which her determination to seek the death penalty was based; and **b)** a motion for summary judgment on their APA claims which would include this Court's order vacating the Attorney General's authorization to seek the death penalty.

The Court **a)** denied plaintiffs' application for an Order to Show Cause in light of the absence of immediate irreparable harm and the long delay between defendant Reno's April 18, 1995 determination to seek the death penalty and the filing of plaintiffs' complaint; and **b)** directed defendant to respond to plaintiffs' Motion for Summary Judgment, including plaintiffs' request that defendant produce the record upon which she relied in making the complained-of-determination.

In her letter-brief response, defendant Reno pointed out that for various reasons, plaintiffs' motion for summary judgment was premature and procedurally infirm. Defendant made an application for permission to file both a motion to dismiss and her opposition to plaintiff's motion for summary judgment by September 12, 1995. The Court granted that application and stayed all discovery in this matter until that time.

Defendant Reno's Motion to Dismiss is now before the Court. Although defendant Reno also requests that plaintiffs' motion for summary judgment be struck for, *inter alia,* failure to comply with the Local Rules for the Northern District of New York, she asks that if plaintiffs' motion is not stricken, the Court also consider her motion to dismiss as her opposition to defendant's motion for summary judgment. Plaintiffs acknowledge that if defendant's motion to dismiss is granted, their motion for summary judgment will be mooted. Plaintiffs also indicate, however, that if defendant's motion is denied, plaintiffs' summary judgment motion cannot be decided until the Court has had the opportunity to review the administrative record upon which defendant Reno relied in making her determination. Plaintiffs request that, in the event her motion to dismiss is denied, the Attorney General should be ordered to produce that administrative record. Plaintiffs' also request leave to supplement their summary judgment motion after examining that file.

## II. DISCUSSION

 The court should not dismiss on a motion under Rule 12(b)(6) unless it is clear that plaintiffs can in no way establish a set of facts to sustain their claim which would permit relief. *Hughes v. Rowe,* 449 U.S. 5, 10, 101 S.Ct. 173, 176–77, 66 L.Ed.2d 163 (1980); *Bass v. Jackson,* 790 F.2d 260, 262 (2d Cir. 1986). In determining the legal sufficiency of their claim, the facts must be judged in the light most favorable to plaintiffs. *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974). Of course the threshold question on this motion is whether, under *any* set of facts, plaintiffs can show that judicial review of the Attorney General's decision is permissible under the APA.

 Under the APA, agency action is presumptively reviewable. *See Abbott Lab. v. Gardner,* 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967). Furthermore, the Department of Justice ("DOJ") is an "agency" within the meaning of that act. *See* 5 U.S.C. 701(b)(1) (an agency is "each authority of the Government of the United States"). Therefore, DOJ's actions, as well as the actions of defendant Attorney General Janet Reno undertaken in her capacity as the head of DOJ, are presumptively amenable to review under the APA. *See e.g. Harper v. Levi,* 520 F.2d 53 (D.C.Cir.1975); *Proietti v. Levi,* 530 F.2d 836 (9th Cir.1976). Of course, defendant Reno is free to assert that a particular challenged "agency action is committed to agency discretion as a matter of law" under 5 U.S.C. § 701(a)(2). Once an agency urges that exception, as the Attorney General has done here, "before any review at all may be had, a party must first clear the hurdle of § 701(a)." *Heckler v. Chaney,* 470 U.S. 821, 828, 105 S.Ct. 1649, 1654, 84 L.Ed.2d 714 (1985).

### A. Committed to Agency Discretion as a Matter of Law:

The Attorney General argues that *Heckler v. Chaney* stands for the proposition that agency enforcement decisions are generally committed to agency discretion as a matter of law. Actually, *Chaney* more squarely

stands for the proposition that as to civil enforcement, "an agency's decision *not* to take enforcement action should be presumed immune from judicial review under § 701(a)(2)." *Chaney,* 470 U.S. at 832, 105 S.Ct. at 1656. (emphasis added). In reaching that conclusion, however, the Supreme Court analogized an agency's determination not to undertake enforcement to "the decision of a prosecutor in the Executive Branch not to indict—a decision which has long been regarded as the special province of the Executive Branch, inasmuch as it is the Executive who is charged by the Constitution to 'take Care that the Laws be faithfully executed.'" *Id.* (citing U.S. Const., Art. II, § 3).

The *Chaney* Court pointed to the exercise of prosecutorial discretion as the paradigm of action committed to agency discretion. *See Falkowski v. E.E.O.C.,* 764 F.2d 907, 911 (D.C.Cir.1985) ("The decision to refuse to provide legal representation is admittedly less similar to the historically protected exercise of prosecutorial discretion than was the decision at issue in *Chaney* to refuse to bring an action to enforce a statute."), *cert. denied,* 478 U.S. 1014, 106 S.Ct. 3319, 92 L.Ed.2d 727 (1986). This perceived similarity between an agency's decisions not to undertake civil enforcement and decisions undertaken within the realm of prosecutorial discretion was one of the bases upon which the Supreme Court concluded that the former were categorically presumptively unreviewable.

Courts have long recognized that decisions "whether or not to prosecute, and what charge to file or bring ... generally rests entirely in [the prosecutor's] discretion." *Bordenkircher v. Hayes,* 434 U.S. 357, 364, 98 S.Ct. 663, 668, 54 L.Ed.2d 604 (1978); *see generally United States v. Nixon,* 418 U.S. 683, 693, 94 S.Ct. 3090, 3099, 41 L.Ed.2d 1039 (1974); *Milliken v. Stone,* 16 F.2d 981 (2d Cir.), *cert. denied,* 274 U.S. 748, 47 S.Ct. 764, 71 L.Ed. 1331 (1927); *United States v. Stan-*

ley, 928 F.2d 575, 580–81 (2d Cir.), *cert. denied,* 502 U.S. 845, 112 S.Ct. 141, 116 L.Ed.2d 108 (1991); *Inmates of Attica Correctional Facility v. Rockefeller,* 477 F.2d 375, 379–81 (2d Cir.1973); *United States v. Pitera,* 795 F.Supp. 546, 568 (E.D.N.Y.1992). When this historical tradition of affording immunity from judicial review to prosecutorial decision-making [3] is viewed in light of *Chaney*'s conclusion that in enacting the APA, the Congress did not intend to alter such traditional immunities, *Chaney,* 470 U.S. at 833, 105 S.Ct. at 1656–57, it becomes clear that decisions and actions undertaken by the Attorney General within the exercise of her prosecutorial discretion should be presumed immune from judicial review under § 701(a)(2). To hold otherwise would be to break with "tradition, case law, and sound reasoning." *Chaney,* 470 U.S. at 831, 105 S.Ct. at 1655; *see also Block v. Community Nutrition Institute,* 467 U.S. 340, 104 S.Ct. 2450, 81 L.Ed.2d 270 (1984) (discussing *implied* preclusion of judicial review under § 701(a)(1) and noting that "the presumption favoring judicial review of administrative action is just that—a presumption. This presumption, like all presumptions ... may be overcome by specific language or specific legislative history that is a reliable indicator of congressional intent").

■ The Court further finds that in undertaking to decide what sentence should be sought within a particular prosecution, whether the sentence sought be probation or capital punishment, the Attorney General acts squarely within the boundaries of her prosecutorial discretion. Decisions as to particular sentences to seek in particular prosecutions, no less than decisions whether or not to prosecute and which charges to bring, involve DOJ's informed assessments of: whether and what level of criminal conduct has occurred; whether DOJ is likely to

---

**3.** Of course, different considerations attach when defendants raise equal protection, due process or other Constitutional objections to a prosecutor's otherwise discretionary decisions. *See McCleskey v. Kemp,* 481 U.S. 279, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987); *see also Wayte v. United States,* 470 U.S. 598, 608, 105 S.Ct. 1524, 1531, 84 L.Ed.2d 547 (1985) (recognizing that while "prosecutorial discretion is broad, it is not unfet-

tered. Selectivity in the enforcement of criminal laws is subject to constitutional constraints." (citations omitted)).

This Court has already decided various Constitutional challenges raised by these plaintiffs in the ongoing criminal prosecution. *See United States v. Walker, et al.,* 910 F.Supp. 837 (N.D.N.Y.1995).

meet with success in having the sentence it seeks in a particular case imposed; whether seeking a particular sentence for particular criminal conduct best suits DOJ's overall enforcement policies; and whether DOJ's resources[4] are best expended in seeking a particular sentence in a particular case or class of cases. *See McCleskey,* 481 U.S. at 295 n. 15, 107 S.Ct. at 1768 n. 15 (discussing individual prosecutors' decisions to seek capital punishment and noting that "decisions whether to prosecute and what to charge necessarily are individualized and involve infinite factual variations"). These assessments, turning as they do on discretionary judgments and internal conclusions regarding DOJ's ordering of its priorities and allocation of its resources, are assessments that courts are ill-suited, and that DOJ is far better-situated, to undertake. *See Inmates of Attica,* 477 F.2d at 380 ("the problems inherent in the task of supervising prosecutorial decisions do not lend themselves to resolution by the judiciary").

■ It follows then, that the Attorney General's decision whether or not to seek capital punishment in a particular prosecution is a presumptively unreviewable action firmly "committed to agency discretion as a matter of law" within the meaning of § 701(a)(2). *Cf. McCleskey,* 481 U.S. at 297, 107 S.Ct. at 1769–70 (1987) (noting, in the context of a statistical challenge to Georgia capital sentencing, that petitioner "challenges decisions at the heart of the State's criminal justice system.... Implementation of these laws *necessarily* requires discretionary judgments. Because discretion is *essential* to the criminal justice process, we would demand exceptionally clear proof before we would infer that the discretion has been abused" (emphasis added)).

## B. Law to Apply:

■ The Attorney General's actions undertaken within her prosecutorial discretion are only *presumptively* unreviewable: review

still may be had in circumstances where the relevant substantive statute limits DOJ's discretion by providing guidelines for the agency to follow in the exercise of its discretion, or, in certain cases, where meaningful and judicially manageable standards otherwise available provide the Court with "law to apply." *Chaney* at 831–35, 105 S.Ct. at 1656–57; *Florida, Dep't of Business Regulation v. United States Dept. of Interior,* 768 F.2d 1248, 1255 (11th Cir.1985) *cert. denied,* 475 U.S. 1011, 106 S.Ct. 1186, 89 L.Ed.2d 302 (1986). In the absence of "law to apply," however, the Attorney General's decision to seek capital punishment in this prosecution remains a decision committed to agency discretion by law within the meaning of § 701(a)(2).

### 1. 21 U.S.C. § 848:

Initially, the Court finds that nothing in 21 U.S.C. § 848 suggests any intent by Congress to circumscribe the Attorney General's traditional prosecutorial discretion. That statute contains nothing approximating judicially manageable standards that might establish limits to the Attorney General's discretion, which might in turn provide the Court with law to apply. The statute simply states that persons found to have violated § 848(e)(1) *"may* be sentenced to death." 21 U.S.C. 848(e)(1)(a) (emphasis added). Indeed, plaintiffs concede that the applicable statute "provides no guidance as to the standards to be applied by the government in deciding whether to seek the death penalty." (Pls. Opp. Memo at 3.) Nor do plaintiff's point to any aspect of the statute's legislative history that might indicate a Congressional intent to limit the Attorney General's discretion.

### 2. The Attorney General's Protocol:

In January of 1995, the Attorney General issued a Protocol entitled Federal Prosecutions in Which the Death Penalty May Be Sought ("Protocol")[5]. The Protocol is pub-

---

4. Well into the third month of trial of plaintiffs' underlying capital prosecution, it appears to the Court that the massive investment of DOJ resources, to say nothing of judicial resources, re-

quired by such a prosecution, could only rarely if ever be worth any perceived gains.

5. In deciding defendant's motion to dismiss the Court may of course make reference to defendant

lished only at § 9–10.000 of the U.S. Attorney's Manual. Through the Protocol it is established that no U.S. Attorney may seek the death penalty without the prior written authorization of the Attorney General. (Protocol at § 9–10.000(A)). The Protocol sets forth procedures by which a United States Attorney may seek such authorization. These procedures include the U.S. Attorney's submission to the Attorney General of a "Death Penalty Evaluation" and a prosecution memorandum (*Id.* at § 9–10.000(C)), followed by the Attorney General's appointment of an internal committee to review those materials and provide the Attorney General with its independent recommendation (*Id.* at § 9–10.000(D)). The Protocol provides that defense counsel will be afforded an opportunity to make submissions in opposition to capital punishment to both the U.S. Attorney and the Committee, prior to a recommendation by either (*Id.*). Finally, the procedures call for review and a final decision by the Attorney General as to whether the death penalty shall be sought (*Id.*).

The Protocol provides "Standards for Determination" to guide all three stages of decision-making (*Id.* at § 9–10.000(G)). Those standards essentially call for a preliminary assessment of the relevant statutory and non-statutory aggravating factors, but also provide that "any legitimate law enforcement or prosecutorial reason which weighs for or against seeking the death penalty" shall be considered (*Id.*). The Protocol also provides that "where concurrent jurisdiction exists with a state or local government, it is anticipated that a federal indictment will be obtained only when the federal interest in the prosecution is more substantial than the interests of the state or local authorities (*Id.* at § 9–10.000(F)). Several factors,[6] "which are not intended to be an exhaustive list," are provided to assist consideration of whether there is a more substantial interest in federal as opposed to state prosecution (*Id.*).

Plaintiffs argue that this Protocol can serve as law to apply, thereby justifying APA review of this otherwise discretionary determination. Plaintiff's urge both a unique theory of Congressional intent and two lines of precedent in support of that theory.

### a. Congressional Intent:

Plaintiffs proffer various news clippings, transcripts and correspondence from the Attorney General (Millus Aff., Ex. A, B, C, & D), that they claim establish that at least some Congressional votes supporting passage of the 1994 Crime Bill, Pub.L. 103–322, 108 Stat. 1796 (September 13, 1994), were procured based on a pledge by the Attorney General to promulgate the aforementioned Protocol in order to insure that death penalty decisions were made in a uniform, fair, and non-discriminatory manner.

The short answer, however, is that this anecdotal evidence in no way establishes Congressional intent that the Protocol serve as a limitation on the Attorney General's exercise of her discretion in seeking the death penalty. Plaintiffs' characterization of the Protocol as the "*quid pro quo* for the adoption of the Clinton Administration's coveted crime bill" (Pl.Memo in Opp. at 10), does not support plaintiffs' conclusion that the Protocol "was adopted for the very purpose of injecting standards into the process . . . thus removing such determinations from the realm of unreviewable 'prosecutorial discretion.'" (*Id.* at 3). Absent legislative action whereby Congress undertakes to embody within a substantive statute its desire to reign in the Attorney General's traditional prosecutorial discretion, there can be no basis for this Court to impute to Congress an intention that the Protocol constitute law to apply, thereby giving rise to judicial review under the APA.

### b. The Relevant Precedent:

Plaintiffs point to various cases that they claim support the proposition that agency

---

Reno's protocol, which was annexed to plaintiffs' motion for summary judgment and is integral to plaintiffs' claims. *Field v. Trump,* 850 F.2d 938, 949 (2d Cir.1988).

**6.** The factors are: (1) the relative strength of the state's interest in prosecution; (2) the extent to which the criminal activity reached beyond the local jurisdiction; (3) the relative ability and willingness of the state to prosecute effectively. (Protocol at § 9–10.000(F).

guidelines may serve as source of "law to apply," thereby giving rise to judicial review of agency action via the APA.

At the threshold, where, as here, the challenged agency action is undertaken within the ambit of such a clear and distinct categorical immunity—DOJ's historical prosecutorial discretion—it seems counter-intuitive to search DOJ's own regulations and internal procedures for law to apply in order to conclude that such discretion has been thereby circumscribed. *See, Webster v. Doe,* 486 U.S. 592, 607–08, 108 S.Ct. 2047, 2055–56, 100 L.Ed.2d 632 (1988) ("Our precedents amply show that 'commitment to agency discretion by law' includes but is not limited to, situations in which there is no 'law to apply.' ... The 'no law to apply' test can account for the nonreviewability of certain issues but falls far short of explaining the full scope of the areas from which the courts are excluded.") (Scalia, J. dissenting); *cf. Texas v. United States,* 951 F.2d 645, 648 (5th Cir.1992) ("An agency decision not to take enforcement action is presumed to be unreviewable in the courts unless Congress imposes explicit restrictions on the scope of agency enforcement discretion, and provides judicially manageable standards for determining when the agency has violated those restrictions") (citing *Chaney* ),[7] *rev'd on other grounds,* 507 U.S. 529, 113 S.Ct. 1631, 123 L.Ed.2d 245 (1993). Nor do the cases plaintiffs rely on necessarily compel such an analysis.

Review of the relevant precedent must proceed from the proposition that plaintiffs have not provided, nor has exhaustive research disclosed, a single case in which any court has found that an internal regulation, guideline or policy statement published in the U.S. Attorney's manual (or elsewhere) gives rise to judicial review under the APA of an action by DOJ undertaken within the exercise of its prosecutorial discretion. The cases upon which plaintiffs rely in urging this Court to undertake such an unprecedented review may usefully be divided into two lines of precedent. Defendant Reno contends that yet a third line of cases is controlling.

### i. Formally Promulgated Regulations as "Law to Apply":

Plaintiffs' first line of cases reflect judicial intervention into agency actions where those agencies failed to comply with their own formally promulgated, or otherwise substantively effective, regulations. *See United States ex rel Accardi v. Shaughnessy,* 347 U.S. 260, 74 S.Ct. 499, 98 L.Ed. 681 (1954) (announcing the doctrine that rules promulgated by a federal agency, which regulate the rights and interests of others, are controlling upon the agency); *Service v. Dulles,* 354 U.S. 363, 77 S.Ct. 1152, 1 L.Ed.2d 1403 (1957) (vacating discharge of State Department employee which contravened the relevant agency regulation); *Hammond v. Lenfest,* 398 F.2d 705, 715 (2d Cir.1968) (vacating Navy's denial of serviceman's application for discharge as conscientious objector). Plaintiffs argue that it follows from these cases that the Protocol can give rise to judicial review under the APA.

In none of these cases, however, did affected persons seek to rely on internally published guidelines or policy statements that were given no substantive effect by those agencies. *See Accardi,* 347 U.S. at 265–66, 74 S.Ct. at 502–03 (interpreting and applying INS promulgated regulations published in the C.F.R. and characterized as "regulations with the force and effect of law supplement[ing] the bare bones of [the relevant statute]"); *Service,* 354 U.S. at 375–76, 77 S.Ct. at 1158–59 (discussing promulgation of Department of State Loyalty and Security Regulations therein transgressed and concluding that "the Regulations thus drew upon all the sources of authority available to the Secretary ... and purported to set forth definitively the procedures and standards to be followed"); *Hammond,* 398 F.2d at 715 ("*a validly promulgated regulation* binds the government as much as the individuals subject to the regulation; and this is no less so because the governmental action is essentially discretionary in nature" (emphasis added))

---

**7.** *Chaney* itself "le[ft] to one side the problem of whether an agency's rules might under certain circumstances provide courts with adequate guidelines for informed judicial review of deci-

sions not to enforce." 470 U.S. at 836, 105 S.Ct. at 1658. *See also supra* note 6 and accompanying text.

(citing *Service*, 354 U.S. at 372, 77 S.Ct. at 1156–57); *cf. Sullivan v. United States*, 348 U.S. 170, 173, 75 S.Ct. 182, 184–85, 99 L.Ed. 210 (1954) (rejecting defendant's motion for dismissal of indictment, which motion relied on an Executive Order and a DOJ Circular Letter requiring the Attorney General to approve all tax prosecutions, in part because the Circular Letter "was never promulgated as a regulation of the Department and published in the Federal Register. It was simply a housekeeping provision of the Department"). Here, in contrast to the regulations implicated in the foregoing cases, the Attorney General's Protocol is published only in her U.S. Attorney's Manual,[8] is not a formally promulgated regulation,[9] and has been given no substantive effect by DOJ itself. In short, the protocol bears little similarity to the regulations acted upon in these cases cited by plaintiffs.

Nor did those cases either concern or give rise to judicial review of an agency determination, under the APA or otherwise, in the absence of law to apply. *See Accardi*, 347 U.S. at 268, 74 S.Ct. at 503–04 ("It is important to emphasize that we are not here reviewing and reversing the *manner* in which discretion was exercised. . . . Rather, we object to the Board's alleged *failure to exercise* its own discretion, contrary to existing valid regulations."); *Service*, 354 U.S. at 388–89, 77 S.Ct. at 1165 (remanding plaintiff's claim for declaratory relief because of Secretary's procedural default); *Hammond*, 398 F.2d at 718 (initially directing district court to review Navy's rejection of application but, upon rehearing, instead remanding for the Navy's redetermination under new regulations).

Most dispositively distinguishing the instant plaintiffs' claims, none of the cited

cases challenged an agency's action undertaken within the exercise of prosecutorial discretion. *See Accardi*, 347 U.S. at 268, 74 S.Ct. at 503–04 (INS civil deportation order); *Service*, 354 U.S. at 388–89, 77 S.Ct. at 1165 (Secretary of State's discharge of a State Department employee); *Hammond*, 398 F.2d at 705 (Navy's denial of application for discharge).

These cases turned, therefore, only on judicial analysis and application of formally promulgated regulations. Furthermore, in none of these cases did agency regulations provide the court with law to apply to decisions otherwise excepted under the APA, or otherwise give rise to judicial review. Finally, none of the challenged agency actions in the foregoing cases were undertaken in the exercise of prosecutorial discretion. In light of all these critical distinctions, the foregoing cases offer the Court little guidance as to the proper effect of the Attorney General's Protocol on plaintiffs' APA claims.

### ii. Internal Policy and Informal Procedures as "Law to Apply":

Plaintiffs' second line of cases reflect extension of the *Accardi* doctrine to agencies *internal* policy statements and *informal* procedures via *Morton v. Ruiz*, 415 U.S. 199, 94 S.Ct. 1055, 39 L.Ed.2d 270 (1974) (holding that where the Bureau of Indian Affair's internal manual required that agency to *publish* eligibility requirements in the CFR, that agency's substantive rule excluding a category of otherwise eligible persons from benefits must be published in accordance with that internal procedure in order to be given substantive effect). *Morton* is broadly inter-

---

8. Defendant Reno points out that the U.S. Attorney's Manual's introduction indicates that it:

> provides only internal Department of Justice guidance. It is not intended to, does not, and may not be relied upon to create any rights, substantive or procedural, enforceable at law by any party in any matter civil or criminal. Nor are any limitations hereby placed on otherwise lawful litigative prerogatives of the Department of Justice.

USAM § 1–1.000 ("Purpose of Manual").

9. In *Chaney*, the Supreme Court rejected plaintiffs' attempt to provide law to apply from an FDA policy statement, based on that statement's vague language. The Court also twice noted that "in any event the policy statement was attached to a rule that was never adopted." While questioning the force that such a policy statement might have, the Court "le[ft] to one side the problem of whether an agency's rules might under certain circumstances provide courts with adequate guidelines for informed judicial review

preted within the Second Circuit.[10] *See Montilla v. INS*, 926 F.2d 162 (2d Cir.1991); *Zhang v. Slattery*, 840 F.Supp. 292 (S.D.N.Y. 1994). *Montilla* announces that the *Accardi* doctrine:

> is not limited to rules attaining the status of formal regulations. . . . "where the rights of individuals are affected, it is incumbent upon agencies to follow their own procedures . . . even where the internal procedures are possibly more rigorous than otherwise would be required," and even though the procedural requirement has not yet been published in the federal register.

*Montilla*, 926 F.2d at 167 (*citing Morton v. Ruiz*); *See also Zhang*, 840 F.Supp. at 294 ("It is well settled that an agency must follow its own internal procedures '[w]here the rights of individuals are affected', whether or not such procedures are formally promulgated."). Plaintiffs argue that these cases provide authority for the Court to accord the Protocol binding effect, from which it follows, according to plaintiffs, that the Protocol can provide the Court with law to apply.

First, the Court notes that just as in the promulgated-regulation cases *supra*, in none of these internal-guideline cases did a court discern law to apply from those guidelines, thereby undertaking otherwise exceptional judicial review under the APA. Second, none of those plaintiffs challenged actions undertaken within the scope of prosecutorial discretion: *Morton*'s plaintiffs challenged an

agency's determination of their ineligibility for assistance benefits; *Montilla* claimed that certain procedural incidents of an unfavorable INS deportation determination showed that the INS had disregarded its own regulations; *Zhang* argued that the INS had ignored its own internal procedures and policies in denying his application for parole.

Finally, the Court finds that generally, the doctrine announced in these cases is applied where agencies have disregarded or ignored their own informal *procedures*, where such procedures governed "The rights or interests of the objecting party." *Montilla*, 926 F.2d at 167. The remedy for such agency procedural defaults is generally remand for agency redetermination in compliance with those internal procedures, not judicial review of the procedurally flawed determination.

In this case, plaintiffs' Complaint contains no allegation [11] that defendant Reno ignored the procedures contained in her Protocol. Indeed from all appearances defendant Reno scrupulously followed her self-prescribed Protocol procedures. Plaintiff has not alleged, for instance, that the U.S. Attorney sought the death penalty without the prior written authorization of the Attorney General, Protocol at § 9–10.000(A), or failed to submit a prosecution memorandum to the Attorney General, *id.* at § 9–10.000(A); or that plaintiffs' counsel were denied a reasonable opportunity to present matters in opposition to capital punishment to the U.S. Attorney and DOJ, *id.* § 9–10,000(B), (D); or

---

of decisions not to enforce." *Chaney*, 470 U.S. at 836, 105 S.Ct. at 1658.

**10.** Indeed, that broad interpretation turns *Morton*'s result on its head if applied as plaintiffs urge.

In *Morton*, the Supreme Court held that an unpromulgated regulation contained only in the Indian Affairs Manual could *not* be given substantive effect, in part because that agency's *un* promulgated internal procedures required promulgation of substantive regulations. Here, *plaintiffs seek to have this Court simply give the equivalent of substantive effect to an unpromulgated internal DOJ procedural policy statement.*

**11.** According to one commentator:

The second consideration in deciding whether there is 'law to apply' is the precise allegation made by the plaintiff. The importance of this point cannot be overstated. . . . For example, if a plaintiff claims that an agency has taken constitutionally impermissible factors into account there is always 'law to apply'—no matter what the governing statute may say. Similarly, if the plaintiff alleges that the agency's conduct has been based on factors that are irrelevant under the governing statute, there is always law to apply. . . . On the other hand, if the plaintiff makes a generalized claim of agency "arbitrariness" . . . there may sometimes be no judicially administrable standards by which to assess the claim. The central point is that the 'law to apply' inquiry can be made coherent only by measuring the plaintiff's allegations against the governing substantive statute. There may be review with respect to one allegation, but no review with respect to another, under the same statute.

Cass R. Sunstein, *Reviewing Agency Inaction After Heckler v. Chaney*, 52 U.Chi.L.Rev. 653, 658–59 (1985).

that the Attorney General failed to appoint a special committee to review all submissions, *id.* § 9–10.000(D), or failed to receive a recommendation from that committee. *Id.* Under the foregoing cases, such allegations might well provide a basis for this Court to set aside defendant Reno's determination and remand the matter to the Attorney General for reconsideration pursuant to the procedures she has prescribed for herself in the Protocol.[12] *But See Montilla,* 926 F.2d at 167 ("To be sure, the cases are not uniform in requiring that every time an agency ignores its own regulation its acts must subsequently be set aside.")

Plaintiffs make no claim, however, that defendant Reno *ignored* or *disregarded* her own *procedures.* Rather, defendants seek substantive review and nullification of the Attorney General's *conclusion*—a conclusion at which she arrived after apparently fully complying with her own informal procedures. *Cf. Accardi,* 347 U.S. at 268, 74 S.Ct. at 503–04 ("It is important to emphasize that we are not here reviewing and reversing the *manner* in which discretion was exercised. . . . Rather, we object to the Board's alleged *failure to exercise* its own discretion, contrary to existing valid regulations"). Passing whether such review *ever* would be proper under the APA, *see Proietti,* 530 F.2d at 838 ("*De novo* review of administrative decisions under the [APA] is proper only under a limited set of circumstances"), these cases lend no support to plaintiffs' proposition that by enacting the Protocol, the Attorney General established law to apply, thereby rebutting the presumptive unreviewability of her prosecutorial decision making and subjecting her discretionary determinations to APA review.

### iii. The "Petite" Policy Cases:

Alternatively, defendant Reno points to the many cases which have refused to give substantive effect to DOJ's "Petite" policy. The Petite policy, found in the U.S. Attorney's

Manual at § 9–2.142, "is an internal statement by the United States Attorney General setting forth guidelines for federal prosecutors regarding dual and successive federal criminal prosecutions." *United States v. Ng,* 699 F.2d 63, 66 n. 3 (2d Cir.1983). At the time the relevant cases were decided, the policy precluded "a federal prosecution following a state prosecution 'based on substantially the same act or acts unless there is a compelling federal interest supporting the dual prosecution.'" *Id.* (citations omitted).

Numerous courts have unanimously concluded that the Petite policy "is merely an internal guideline for exercise of prosecutorial discretion, not subject to judicial review." *Id.* at 71; *see also United States v. Alston,* 609 F.2d 531, 536–37 (D.C.Cir.1979) ("The Petite policy is not law, but rather an executive policy that permits of exceptions in the Attorney General's discretion."); *United States v. Booth,* 673 F.2d 27, 30 (1st Cir.1982) ("[Petite policy] is one of federal prosecutorial policy, . . . and does not create a corresponding right in the accused"), *cert. denied,* 456 U.S. 978, 102 S.Ct. 2245, 72 L.Ed.2d 853 (1982); *United States v. Snell,* 592 F.2d 1083, 1087 (9th Cir.) (describing Petite policy as merely an "internal housekeeping rule," the violation of which does not entitle the criminal defendant to judicial relief) *cert. denied,* 442 U.S. 944, 99 S.Ct. 2889, 61 L.Ed.2d 315 (1979); *cf. Sullivan,* 348 U.S. at 173, 75 S.Ct. at 184 (rejecting defendant's reliance on a policy embodied in DOJ Circular Letter: Letter "was never promulgated as a regulation of the Department and published in the Federal Register. It was simply a housekeeping provision of the Department").

Like the Petite policy, the Protocol considered here is published only in the U.S. Attorney's Manual, which expressly disclaims the creation of any rights, substantive or procedural. *See* n. 5 *supra.* Additionally, both the Petite policy and the protocol were devised and disseminated primarily, if not ex-

---

12. Even if plaintiffs' Complaint alleged that the Attorney General entirely disregarded the Protocol, in order to invoke these holdings plaintiffs would also have to establish that the Protocol was enacted for the benefit of individual defendants charged with crimes that exposed them to

the possibility of capital punishment, *Zhang,* 840 F.Supp. at 295 (citing *Montilla* ), and not simply to "govern internal agency procedures." *Montilla,* 926 F.2d at 167. This question is not addressed under the result herein.

clusively, to govern and render consistent internal DOJ decisionmaking: while neither the policy nor the protocol are constitutionally required, DOJ enacted both to remove unfairness from the prosecutorial process. *Compare Rinaldi v. United States,* 434 U.S. 22, 27, 98 S.Ct. 81, 84, 54 L.Ed.2d 207 (1977) (the policy serves the important purpose "of protecting the citizen from any unfairness that is associated with successive prosecutions based on the same conduct"), *with* Protocol at § 9–10.000(G) ("The authorization process is designed to promote consistency and fairness"). Furthermore, like the Petite policy-based challenges considered in these cases, plaintiffs' Complaint challenges an agency action undertaken squarely within that agency's exercise of its prosecutorial discretion.

Finally, the underlying rationales for these Courts' conclusions that the Petite policy provides no basis for review or dismissal of individual indictments (*i.e.* that the policy is a non-constitutionally required internal rule, critically distinct from a formally promulgated regulation, *Snell,* 592 F.2d at 1087), are equally compelling when applied to the Protocol. This is particularly true of the Ninth Circuit's conclusion that the contrary rule—which would accord binding effect to such guidelines—would risk discouraging the agency "from adopting other such laudable policies." *Snell,* 592 F.2d at 1087; *cf. Community Nutrition Institute v. Young,* 818 F.2d 943 (D.C.Cir.1987):

> Our holding today in no way indicates that agencies develop written guidelines to aid their exercise of discretion only at the peril of having a court transmogrify those guidelines into binding norms. We recognize that such guidelines have the not inconsiderable benefit of apprising the regulated community of the agency's intentions as well as informing the exercise of discretion by agents and officers in the field. It is beyond question that many such statements are non-binding in nature and would thus be characterized by a court as interpretative rules or policy statements. We are persuaded that courts will appropriately reach an opposite conclusion only where, as here, the *agency* itself has given its rules substantive effect.

The Court perceives no meaningful basis upon which to distinguish the postures, the rationales or the conclusions of the petite policy cases: these cases provide by analogy a far better basis for decision of plaintiffs' APA claims than either the *Accardi–Service* or *Morton–Montilla* cases urged by plaintiffs. Application of the Petite policy holdings to plaintiffs' claims compels the conclusion that the Attorney General's internally developed Protocol should not be accorded binding effect on defendant Reno. It follows then, that the Protocol is an improper source of law to apply and may not serve as a basis for judicial review of DOJ actions undertaken within its traditional prosecutorial discretion.

**C. The Language and Content of the Protocol:**

■ Finally, assuming *arguendo* that a viable legal theory supported plaintiffs' claim that informal agency guidelines could rebut the presumptive unreviewability of actions committed to agency discretion by law, defendant Reno argues that her Protocol is worded so as to completely preserve her discretion and could in no event provide meaningful law to apply so as to give rise to judicial review according to its terms. The Attorney General points in particular to the section of the protocol that plaintiffs argue provides the most appropriate standard for judicial review:

> Where concurrent jurisdiction exists with a state or local government, it is **anticipated that** a federal indictment for an offense subject to the death penalty will be obtained only when the federal interest in the prosecution is more substantial than the interests of state or local authorities. *See* Principles of Federal Prosecution, USAM 9–27.000 . . .
>
> The following factors, **which are not intended to be an exhaustive list, may be considered** in deciding whether there is a more substantial interest in federal as opposed to state prosecution of the offense. . . .

(Protocol at § 9–10.000(f)) (emphasis added);

The Court agrees that given the Protocol's discretionary and permissive language, and

its publication within the U.S. Attorney's Manual (the introduction to which expressly precludes the creation of any enforceable substantive or procedural rights, *see* n. 5 *supra* and accompanying text), it is difficult to perceive any abdication by defendant Reno of her traditional discretion in determining which sentences to pursue in particular cases. *Cf. Webster,* 486 U.S. at 602 n. 7, 108 S.Ct. at 2053 n. 7 ("The Court of Appeals, however, found that the CIA's own regulations plainly protect the discretion granted the Director ... and that the regulations 'provid[e] no independent source of procedural or substantive protections.'") (citation omitted).

Furthermore, while the Protocol outlines various factors that "may be considered" by the Attorney General in making her determination, defining the substantive content of these factors would in itself require nice decision-making turning on the exercise of informed discretion. *Compare* the Petite policy's "compelling federal interest" *with* the Protocol's "substantial federal interest." Nor does the Protocol direct how those factors should be weighed or balanced. *Cf. Florida Dept. of Bus. Reg.,* 768 F.2d at 1256 (holding that although duly enacted regulations set forth factors "guid[ing] the exercise of the [Interior] Secretary's discretion, [factors] are not 'law' that a reviewing court can apply. The regulation does not purport to state how the agency should balance these factors in a particular case, or what weight to assign to each factor. Nor does it mandate ... or limit the size of acquisitions."); *see also Panama Canal Co. v. Grace Line, Inc.,* 356 U.S. 309, 317, 78 S.Ct. 752, 757, 2 L.Ed.2d 788 (1958) (although statute described in detail the formula to be applied when Secretary established toll amounts, decision was one left to agency discretion be-

cause matter was one "on which experts may disagree," involving "nice issues of judgment and choice which require the exercise of informed discretion"); *Strickland v. Morton,* 519 F.2d 467 (9th Cir.1975) (Secretary's decision that public land was suitable for disposal is unreviewable despite statute's listing ten "reasons" to guide the decision).

In short, the Court finds that the language and content of the Protocol itself neither circumscribes the Attorney General's discretion nor provides meaningful and judicially manageable standards. It follows then, that even if the Court were persuaded that DOJ's unpromulgated internal statements of policy could *ever* justify judicial review of that agency's exercise of its prosecutorial discretion, in this case the Attorney General's death penalty Protocol does not provide sufficient and meaningful "law to apply."

## III. CONCLUSION

For all the foregoing reasons, the Court finds that the Attorney General's determination to seek capital punishment in the prosecution of these plaintiffs is an action committed to agency discretion as a matter of law within the meaning of § 701(a)(2). The Court further finds that the Attorney General's Protocol provides an improper and insufficient source from which this Court could draw law to apply and thereby review that determination under the APA. It follows then, that plaintiffs' Complaint seeking such review must be, and hereby is, DISMISSED.

**IT IS SO ORDERED.**