UNITED STATES of America

v.

Daniel Lewis LEE, a/k/a Daniel Lewis Graham, D.L. Graham, and Danny Lee.

No. LR–CR–97–243(2).

United States District Court,
E.D. Arkansas,
Western Division.

March 21, 2000.

Dan Stripling, Robert A. De La Cruz, U.S. Atty.'s Office, E.D. Ark., Little Rock, AR, for U.S.

John T. Lassiter, Hatfield & Lassiter, Little Rock, AR, Cathleen V. Compton, Little Rock, AR, for Defendants.

## MEMORANDUM OPINION AND ORDER REGARDING FUTURE DANGEROUSNESS AND THE DEATH PENALTY PROTOCOL

EISELE, District Judge.

There are two matters that are currently pending in Defendant Danny Lee's case. First, Defendant Lee has filed a Motion for a New Sentencing Phase Trial due to the improper introduction of evidence regarding his alleged propensity for future dangerousness. Second, this Court must resolve the issue of whether Defendant Lee has the right to require the Attorney General to follow the Death Penalty Protocol found in the United States Attorney's Manual before exercising her prosecutorial discretion in deciding whether to withdraw or decertify the death penalty notice in this case. Each issue will be considered separately.

## FUTURE DANGEROUSNESS

### I. Background

Defendant Lee and his co-defendant, Chevie Kehoe, were convicted by a jury of participating in a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c), conspiring to violate the racketeering statute in violation of 18 U.S.C. § 1962(d), and committing three violent acts in aid of racketeering, namely three murders under Arkansas law, in violation of 18 U.S.C. § 1959(a)(1). In separate sentencing hearings, the same jury "recommended" that Defendant Kehoe be sentenced to life without possibility of release for each of the murders and that Defendant Lee be sentenced to death for each of the three murders.

In its notice of intent to seek the death penalty against Defendant Lee, the Government, as required by statute, identified several aggravating factors that it anticipated using at sentencing. For each of the murders, the Government offered the following statutory aggravating factors: 1) that Defendant Lee murdered each victim in expectation of the receipt of anything of pecuniary value; 2) that Defendant Lee murdered each victim after substantial planning and premeditation; and 3) that Defendant Lee intentionally killed or attempted to kill more than one person during a single criminal episode. For the Sarah Powell murder, the Government offered the additional statutory aggravating factor that the victim was particularly vulnerable due to her youth, that being eight years of age. For each of the murders, the Government offered the non-statutory aggravating factor of future dangerousness. It is the last of said factors, future dangerousness, that is the subject of Defendant Lee's motion.

During the pre-trial stages of the case, Defendant Lee retained a mental health expert to assist in his defense in the event a sentencing hearing was necessary. The Government, in turn, requested discovery from the Defendant as to his mental health

evidence so that it would be able, if necessary, to rebut Defendant Lee's evidence. The Government emphasized in its request:

> The United States will *not* introduce mental health evidence during its case-in-chief in the penalty phase. Instead, the United States would only use this evidence to rebut any mental health evidence introduced by the defendant in his case-in-chief. If the defendant does not introduce the evidence, the United States will not introduce mental health evidence.

Gov't Mot. for Disc. of Mental Health Evid. Re: Def. Lee, Doc. No. 627, at 2 (emphasis in original). At that time, the Government anticipated that Defendant Lee would use his mental health expert to present mitigation evidence as well as to rebut the Government's non-statutory aggravating factor of future dangerousness. The Defendant objected to the requested disclosure.

The Court, following the case of *United States v. Beckford,* 962 F.Supp. 748 (E.D.Va.1997), informed the parties that it was inclined to grant the Government's request. Consequently, the parties submitted to the Court a proposed order, which the Court signed, setting forth a mental health evidence disclosure process much like the procedure followed in *Beckford. See* Order Re: Mental Health Issues–Defendant Lee, Doc. No. 665, dated Mar. 31, 1999. Pursuant to the Order, Defendant Lee was required to submit to an examination by the Government's mental health expert.

As trial preparations continued, Defendant Lee and his mental health expert, Dr. Mark Cunningham, a forensic psychologist, ultimately decided not to attempt to rebut the Government's evidence of future dangerousness. This decision was based at least in part on the fact that pre-trial rulings by United States Magistrate John F. Forster, Jr., prevented Dr. Cunningham from obtaining all the information he felt necessary to complete a proper risk assessment. As a result of said decision, Dr. Cunningham did not perform a risk assessment for future dangerousness of Defendant Lee. However, the Government's expert, Dr. Thomas Ryan, as part of his examination of Defendant Lee, did perform a risk assessment analysis.

During its case-in-chief at Defendant Lee's penalty phase trial, the Government offered four factual instances in support of its claim of future dangerousness. First, by way of the testimony of Randall Yarbrough, Chai Choi, Brian Compton, and Rochelle Ezzi, and the former testimony of the Defendant, the Government presented evidence of Defendant Lee's involvement in the murder of Joseph John Wavra in Oklahoma when the Defendant was age seventeen. Second, through the testimony of Nancy Cummings, the Government presented evidence that Defendant Lee verbally assaulted and threatened a Pulaski County Sheriff's Deputy while incarcerated during the trial of this case. Third, the Government offered into evidence a 1995 Florida conviction record for Defendant Lee for the crime of carrying a concealed weapon. Fourth, the Government presented evidence of Defendant Lee's lack of remorse as evidenced by his statements made to Gloria Kehoe. In sum, the Government's case-in-chief was brief, covering only approximately eighty-two pages of transcript.

The Defendant offered the following mitigating factors in his defense: 1) Defendant Lee's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law was impaired, regardless of whether his capacity was so impaired as to constitute a defense to the charge; 2) Defendant Lee was under duress, regardless of whether the duress was of such a degree as to constitute a defense to the charge; 3) Defendant Lee does not have a significant prior criminal record other than his juvenile record; 4) Defendant Lee committed the killing or killings under mental or emotional disturbance; 5) another person equally culpable in the crimes will not be punished by

death; 6) Defendant Lee was subjected to emotional and physical abuse, abandonment and neglect as a child and was deprived of the parental guidance and protection which he needed; 7) Defendant Lee suffered from neurological impairments that were identified and which could have been treated when he was a child and adolescent; 8) Defendant Lee suffers from brain dysfunction, which has gravely impaired his ability to function in the absence of strong support and guidance; 9) Defendant Lee was introduced to drugs and alcohol while still a child; 10) Defendant Lee needs a structured environment and would likely benefit from the structure of a prison; 11) Defendant Lee was only 22 years old when the murders were committed; 12) Defendant Lee is a follower and was under the influence of Chevie Kehoe and possibly others at the time of the offense; 13) other persons were involved in this racketeering enterprise and conspiracy who will under the law receive no sentence or substantially less punishment or were not prosecuted; and 14) Mr. Kirby Kehoe was involved in the planning of the 1996 burglary of the Muellers.

Defendant Lee presented exclusively mitigation evidence in his defense; he did not attempt to rebut any of the Government's evidence in support of aggravation. During his defense, Defendant Lee presented the testimony of Dr. Cunningham. Dr. Cunningham offered testimony concerning Defendant Lee's life, concluding with his opinion of the formative factors in Defendant Lee's life. Dr. Cunningham did not offer risk assessment or future dangerousness testimony. He limited his testimony to explaining Defendant Lee's mitigators to the jury.

The Government's cross-examination of Dr. Cunningham was extensive and the subject of much controversy. Finally, the Government offered the testimony of Dr. Ryan in its rebuttal case. Dr. Ryan's testimony is also the subject of dispute.

In his current Motion, Defendant Lee contends that he was deprived of his right to a fair sentencing proceeding in two respects. First, Defendant Lee contends that this Court erred in permitting the Government to go as far as it did during its cross-examination of Dr. Cunningham. In particular, the Defendant asserts that the Government used its cross-examination of Dr. Cunningham to improperly develop *new evidence of risk assessment and future dangerousness* that was neither permitted by the Court's instructions, mentioned in the Government's case-in-chief, nor, reasonably analyzed, covered in the Defendant's direct examination of Dr. Cunningham. Second, Defendant Lee claims that the Court erred in permitting the Government to go beyond the scope of permissible rebuttal by questioning Dr. Ryan about risk assessment and future dangerousness when such matters were not raised by Defendant Lee in his defense, and further, that such evidence of future dangerousness went beyond the limits specifically set forth in the Court's instructions.

## II. Discussion

### A. Authority to Consider Motion

■ Before delving into the merits of these two arguments, the Court must first decide if it has the authority to do so upon Defendant Lee's post-conviction motion. Rule 33 of the Federal Rules of Criminal Procedure provides, in relevant part, that "the court may grant a new trial to th[e] defendant if the interests of justice so require." Furthermore, it is clear that "[d]istrict courts have broad discretion in passing upon motions for new trial and such rulings are subject to reversal only for a clear abuse of discretion." *United States v. Saborit,* 967 F.Supp. 1136, 1144 (N.D.Iowa 1997) (citing Eighth Circuit cases).

■ Likewise, Fed.R.Cr.P. 35(c) provides, in relevant part, that "[t]he court, acting within 7 days after the imposition of sentence, may correct a sentence that was imposed as a result of arithmetical, technical, or other clear error." Again, such a ruling is left to the sound discretion of the

trial court. *See United States v. Gruenberg,* 53 F.3d 214, 215 (8th Cir.1995) (considering Rule 35(a) motion); *United States v. Jenkins,* 105 F.3d 411, 411 (8th Cir.1997) (considering Rule 35(b) motion); *see also United States v. Durham,* 178 F.3d 796, 799 (6th Cir.1999) (considering Rule 35(c) motion).

█ The Government argues that the cited rules of criminal procedure do not apply to a case under the Federal Death Penalty Act of 1994 ("FDPA"). It contends that the trial court has no post-sentencing authority other than to sentence the Defendant as recommended by the jury and that the Defendant's only method to obtain relief is on appeal as provided in section 3595 of the FDPA. Clearly, the Federal Rules of Criminal Procedure do not contemplate a case such as Defendant Lee's because they were drafted long before the FDPA came into existence. That is not to say, however, that Congress, in drafting the FDPA, did not intend for the rules of criminal procedure to apply. As the Fifth Circuit has aptly stated:

The Federal Rules of Criminal Procedure apply to sentencing hearings; Fed. R.Crim.P. 1 provides, "These rules govern the procedure in all criminal proceedings in the courts of the United States...." Rule 54, Fed.R.Crim.P., excludes certain proceedings, but not sentencing hearings. Section 3593(c) waives rule 32(c)'s presentence report requirement, which suggests the negative implication that the Rules of Criminal Procedure usually do apply to sentencing hearings under the FDPA.

*United States v. Webster,* 162 F.3d 308, 346 (5th Cir.1998), *cert. denied,* — U.S. ——, 120 S.Ct. 83, 145 L.Ed.2d 70 (1999). Therefore, this Court has the authority it would have in any other case to grant the Defendant post-sentencing or post-conviction relief.

As a forethought, the Court acknowledges that Defendant Lee's arguments are worthy of extremely careful scrutiny because this is a death penalty case and, as

such, Defendant Lee's life is at stake. The court in *United States v. Pena–Gonzalez,* 62 F.Supp.2d 358, 360 (D.P.R.1999), appropriately described decisions in death penalty cases as follows:

[This decision] entails the unique gravity appropriate for capital cases. Capital punishment is qualitatively different from any other form of criminal penalty we may impose. *Woodson v. North Carolina,* 428 U.S. 280, 305, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976). With it, we deny the convict any possibility of rehabilitation and order instead his execution, the most irrevocable of sanctions. *Gregg v. Georgia,* 428 U.S. 153, 187, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976). Its severity demands a heightened need for reliability in the determination that death is the appropriate punishment in a specific case. *Caldwell v. Mississippi,* 472 U.S. 320, 323, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985) (citing *Woodson,* 428 U.S. at 305, 96 S.Ct. 2978). We must be, therefore, particularly sensitive to insure that unique safeguards are in place that comport with the constitutional requirements of the Due Process Clause of the Fourteenth Amendment and the Eighth Amendment. *Gregg,* 428 U.S. at 187, 96 S.Ct. 2909.

Furthermore, it has been said that, "[i]n capital proceedings generally, th[e] [Supreme] Court has demanded that factfinding procedures aspire to a heightened standard of reliability. This especial concern is a natural consequence of the knowledge that execution is the most irremediable and unfathomable of penalties; that death is different." *Ford v. Wainwright,* 477 U.S. 399, 411, 106 S.Ct. 2595, 91 L.Ed.2d 335 (Marshall, J., plurality opinion) (citing *Spaziano v. Florida,* 468 U.S. 447, 456, 104 S.Ct. 3154, 82 L.Ed.2d 340 (1984); *Woodson v. North Carolina,* 428 U.S. 280, 305, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976)).

## B. Examination of Dr. Cunningham

█ Turning to the merits, Defendant Lee first argues that the Government exceeded the permissible scope of cross-ex-

amination in its questioning of Dr. Cunningham. Section 3593 of the FDPA sets forth the procedure for a death penalty sentencing hearing under the act:

At the sentencing hearing, information may be presented as to any matter relevant to the sentence, including any mitigating or aggravating factor permitted or required to be considered under section 3592.... The defendant may present any information relevant to a mitigating factor. The government may present any information relevant to an aggravating factor for which notice has been provided .... Information is admissible regardless of its admissibility under the rules governing admission of evidence at criminal trials except that information may be excluded if its probative value is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury.... The government and the defendant shall be permitted to rebut any information received at the hearing, and shall be given fair opportunity to present argument as to the adequacy of the information to establish the existence of any aggravating or mitigating factor, and as to the appropriateness in the case of imposing a sentence of death. The government shall open the argument. The defendant shall be permitted to reply. The government shall then be permitted to reply in rebuttal. The burden of establishing the existence of any aggravating factor is on the government, and is not satisfied unless the existence of such a factor is established beyond a reasonable doubt. The burden of establishing the existence of any mitigating factor is on the defendant, and is not satisfied unless the existence of such a factor is established by a preponderance of the information.

18 U.S.C. § 3593(c) (Supp.1999).

Rule 611(b) of the Federal Rules of Evidence provides that "[c]ross-examination should be limited to the subject matter of the direct examination and matters affecting the credibility of the witness. The court may, in the exercise of discretion, permit inquiry into additional matters as if on direct examination." Generally, the scope of cross-examination is limited to matters testified to on direct plus matters bearing upon the credibility of the witness. *United States v. Thomas*, 58 F.3d 1318, 1322 (8th Cir.1995); Fed.R.Evid. 611 advisory committee's note. Furthermore, restriction of the scope of cross-examination is a matter committed to the sound discretion of the trial court. *United States v. Lee*, 743 F.2d 1240, 1249 (8th Cir.1984).

The Court has reviewed Dr. Cunningham's direct testimony in painstaking detail. Dr. Cunningham, in large part, served as a narrator for the events in Defendant Lee's troubled life until he reached the age of seventeen or eighteen.[1] He told the jury about the individuals involved in Defendant Lee's life, how they treated him, what problems they themselves had, and how their actions affected Defendant Lee. Dr. Cunningham also testified about problems Defendant Lee experienced growing up, such as medical problems, problems in school, and substance abuse problems. In sum, Dr. Cunningham's testimony amounts to an attempt to explain to the jury how Defendant Lee's involvement in the crimes for which he was convicted was affected by external factors beyond the Defendant's control. Ultimately, Dr. Cunningham declared that "My opinion is that Danny Lee experienced many traumatic and adverse life experiences that fundamentally shaped him. It shaped him neurologically, psychologically, socially, emotionally and ethically, and that I think contributed to his involvement in this offense." Tr. at 7742.

Admittedly, Dr. Cunningham mentioned that Defendant Lee exhibits anger, acting out, a lack of trust, and rebellious behav-

---

1. Dr. Cunningham was able to testify for others in his narrator role because of section 3593(c)'s relaxed evidentiary standard. *See United States v. Jones*, 132 F.3d 232, 241 (5th Cir.1998), *aff'd*, 527 U.S. 373, 119 S.Ct. 2090, 144 L.Ed.2d 370 (1999) (stating that sentencing hearing is not governed by traditional evidentiary restraints).

ior. He even stated that persons with histories similar to that of Defendant Lee would be at risk for violence in adulthood. However, Dr. Cunningham was very careful not to offer any opinion on Defendant Lee's future dangerousness. Indeed, as Dr. Cunningham himself stated, "the focus of my evaluation ... was on formative factors that brought [the defendant] to this place and was not specifically oriented toward what is his diagnosis at this time." Tr. at 7744. The Government itself acknowledges that "Dr. Cunningham did not make any diagnosis. Rather, he identified features of Lee's life that made him at risk for a variety of psychological conditions." Gov't Briefre: Alleged Punishment Phase Error Supplemental, Doc. No. 939, at 2 (emphasis omitted).

The Government, on the other hand, focused almost exclusively on future dangerousness in its cross-examination of Dr. Cunningham. The first substantive question posed by the Government to Dr. Cunningham was "Do you have an opinion whether or not Mr. Lee is a dangerous person, a violent person, as he sits here today?" Tr. at 7745. The next substantive question was "During [my] opening statement I said to the jury that Mr. Lee is a violent man. Is that true?" Tr. at 7745. At that point, counsel for Defendant Lee asked to approach and made a motion in limine to exclude any questioning as to risk assessment or future dangerousness:[2]

MS. COMPTON: Actually I meant to make a motion in limine at the end of my direct examination of Dr. Cunningham. This becomes very important. Dr. Cunningham did not perform a risk assessment on Danny Lee. He did not come here and testify as to his future dangerousness or lack thereof. Now, admittedly, in the affidavit that he gave to the Court, he said that he might go

there. However, we did not do that. And I don't think that Dr. Cunningham is going to be prepared to talk about risk assessment and future dangerousness given the fact that he and I decided not to go into that after [the Magistrate Judge] overruled us on some of the issues that we had asked about and additional tours of the Bureau of Prisons, additional information that Dr. Cunningham was going to need if we were going to do risk assessment and future dangerousness. We are not.

Dr. Cunningham is doing strictly mitigation. I would move in limine to keep the government from going into an area which has not been brought out in direct and which isn't going to be. His assessment is strictly as to mitigation and not as to risk assessment of future dangerousness. We are not prepared to go there.

THE COURT: I gather the report, which I have not seen, does go beyond what you used on direct?

MS. COMPTON: No, sir.

THE COURT: It does not?

MS. COMPTON: We don't do any risk assessment or future dangerousness. It is strictly within mitigation and psychological factors as has been testified to on direct.

THE COURT: Well, he has identified himself as a clinical and forensic psychologist with a Ph.D. degree. He has had an intimate investigation of the Defendant, so I think Mr. Liroff should be able to ask him in his opinion if he is dangerous. Now, he can handle himself. If it's in the area of his expertise and considering what has been revealed about his intimate knowledge of the man, he can inquire. I think the expert is fully capable of explaining why he can't answer certain of these questions.

---

**2.** The Court believes this motion to be a proper objection by Defendant Lee to improper cross-examination by the Government, contrary to the Government's argument that Defendant Lee did not timely object and therefore had waived any claim of error. In addition, counsel for Defendant Lee later stated, "I was assuming that I had an ongoing objection because of my motion so I didn't stand up and object every time." Tr. at 7832. The Court responded, "That's true, I understood that. In fact, we talked about that before the evening recess." Tr. at 7832.

MS. COMPTON: All right.

THE COURT: He is in effect making him his own witness, is he not, when he goes out of the realm of what you've questioned him about. He runs somewhat of a risk. But as far as just saying, no, you can't do that, I don't think I'm in a position to do that. It's up to the witness to say I'm not prepared to handle that, or I don't have enough information to do it, or I need more studies or whatever. So I'm going to let him inquire. The witness—at some point I may feel that it's diminishing returns here.

Tr. at 7746–48.[3]

When the Government resumed questioning, it again focused on violence. The

**3.** This colloquy makes clear the Court's assumptions and reasoning which led it into error. The Court had in mind a common situation with respect to such expert psychological or psychiatric testimony, i.e., where the expert covers, say, two completely separate relevant areas thoroughly in his or her pre-trial examination and analysis of a defendant but, then, because the result of the expert's examination into one of those areas is not favorable to the defendant, the expert attempts to limit his or her testimony solely to the other area which, assumedly, *is* favorable to the defendant. If the expert witness acknowledges on cross-examination that he is thoroughly prepared on both areas, then it has been this Court's practice to permit the Government to develop such information and opinions on cross-examination.

Here, since the Court did not understand clearly just what areas into which Dr. Cunningham had gone in his pretrial studies of Defendant Lee, it opted to let the Government tentatively explore the situation. Therefore, at the very least, the Court should have cut off the examination as soon as it became apparent that the Government was going into areas into which Dr. Cunningham had not qualified himself to render any opinion—the area of future dangerousness.

On February 18, 2000, Defendant Lee submitted (attached to Brief) the affidavit of Dr. Cunningham. It clearly shows the experience and expertise Dr. Cunningham has in the area of "future dangerousness." However, because of the circumstances, it was decided not to examine Defendant Lee and make the other studies necessary in attempt to refute the Government's aggravating factor of future

following is a complete list of the questions posed by the Government to Dr. Cunningham from the time of the aforementioned bench conference to the Court's recess for the day on Wednesday, May 12, 1999:

BY MR. LIROFF:

Q. Is this man, your client, Mr. Lee, is he a dangerous man? (Tr. at 7748).

Q. Is there a feature of his personality that he is a person who likes violence? (Tr. at 7749).

Q. This is, this offense is isolated in terms of the violence that was displayed? Is that your answer? (Tr. at 7749).

Q. His record is replete with evidence of violence. (Tr. at 7750).

dangerousness. In this connection, the Court's notes paragraph 9 (page 7) of the affidavit, to wit:

> In preparation to individualize the violence risk assessment to Mr. Lee, I requested specific statistical data and procedures, including the rate of assaults among white supremacists in BOP. Mr. Lane Liroff did not provide this and other important data. I additionally requested that I be allowed a tour of several U.S. Penitentiaries and a more detailed tour of ADX Florence, such as had been provided to Dr. Thomas Ryan, the Government's expert in *U.S. v. Danny Lee.* These tours would have allowed me additional specific perspectives regarding confinement, rehabilitation, and treatment programs for Mr. Lee. Mr. Liroff strongly protested these tours in appearing before Judge Forster, asserting that such tours were against BOP policy and would seriously compromise the security of the U.S. Penitentiaries. However, I subsequently discovered correspondence in my files that would seem to dispute Mr. Liroff's representations. This correspondence was from a prior federal capital case (*U.S. v. LaFawn Bobbitt* ) where prison tours had been ordered, but could not be accomplished before trial. In this correspondence (attached), Mr. Rick Schott (Attorney, U.S. Department of Justice, Federal Bureau of Prisons, U.S. Penitentiary) detailed that my proposed tour of U.S. Terre Haute would be the same as that afforded the *general public.* In the absence of the requested data, I could not sufficiently and reliably individualize my risk assessment of Mr. Lee.

Q. In terms of the contextual situation, it is across the board. He has committed violence in institutions? (Tr. at 7750).

Q. He has committed violence in institutions against peers? (Tr. at 7750).

Q. I should say that in a more straight-forward language. While incarcerated, while in custody, he had assaulted other patients or inmates? (Tr. at 7750).

Q. Are you aware that while incarcerated in this case pending trial he assaulted other inmates? (Tr. at 7750–51).

Q. Doctor, I will get back to that. You answered that you don't recall. He has no understanding or appreciation of the enormity of this situation, does he? (Tr. at 7751).

Q. Did you hear the comment he made a moment ago? (Tr. at 7751, referring to the defendant's having stated "Bullshit" in response to one of Mr. Liroff's questions).

Q. Do you know that's not the first time? (Tr. at 7751).

Q. Do you know that he regularly states pejorative obscene insults to the lawyers in this case? (Tr. at 7751).

Q. Is that a sign of paranoia? (Tr. at 7751).

Q. Let's talk about his violence. He has been violent in institutions against staff? (Tr. at 7752).

Q. And recently there was an attempt or at least an expression of threat of violence against staff? (Tr. at 7752).

Q. This is the type of thing, one aspect, that suggests if incarcerated he will continue to be a threat, present a threat of violence? Yes? (Tr. at 7752).

Q. So what you are saying is we have to see if he actually hurts somebody first to see if he will hurt somebody? (Tr. at 7753).

Q. You've testified, I believe today, that he exercises poor judgment? (Tr. at 7753).

Q. Do you know of a study, scientific study, that says those features go away when you enter a prison? (Tr. at 7753).

Q. Yesterday I used a term "psychopath." The question is, is that a psychological term? (Tr. at 7754).

Q. Do you recognize it? (Tr. at 7754).

Q. And does it come from a test, a psychological instrument prepared by a Dr. Hare? (Tr. at 7754).

In this seven-page section alone, the Government used a form of the word "violence" nine times and was able to elicit from Dr. Cunningham in his responses fifteen mentions of some form of the word "violence." The next morning, the Government continued to elicit testimony from Dr. Cunningham relating to Defendant Lee's violent tendencies:

BY MR. LIROFF:

Q. In the investigation in this case did you learn that during the course of that relationship that Mr. Lee partook of domestic violence as against Jennifer?

A. Yes, I did.

Q. And you learned that Mr. Lee in fact abused her physically when she was pregnant with his child.

A. I heard testimony to that effect, that's correct.

Q. And in fact that there was a point when—have you seen a police report relating to an incident of domestic violence between Jennifer and Mr. Lee?

\* \* \* \* \* \*

Q. Were you aware of an incident where she tore up his photograph of Adolph Hitler and he attacked her and the police had to be called?

A. I heard that described. Yes, I did.

Q. In your review of the records there is [sic] other instances of violence, behavior, violent behavior by Mr. Lee?

A. Yes, there is.

Q. Was there substantial discussion, excuse me, discussion of the fact that Mr. Lee assaulted his sister, his younger sister Carrie?

A. There was a reference to that as well, on a single occasion as I recall.

Q. Was there, and I'm not sure how accurate it is, I don't know if you were able to ascertain anything about it, but there was also a reference of Mr. Lee assaulting his mother?

\* \* \* \* \* \*

Q. And there was also discussion in the record relating to burglary offenses?

A. That's correct.

Q. That Mr. Lee broke into homes and took things?

A. There was a burglary II charge as I recall.

Q. Several?

A. There's at least a single one and I think there's more than one. I can look at my—

Q. That's fine. Will you agree there's more than one?

A. I believe that's the case.

Q. An arson offense?

A. That's correct.

Q. Threatening a state witness?

A. That's correct.

\* \* \* \* \* \*

Q. And while Mr. Lee is at these facilities he's assaulting other patients or inmates?

A. I don't know if the word assault is usually the case. They talk about discharging him because of violence, they talk about him being aggressive with staff and other patients and making threats or being intimidating. There is not—I'm hesitant to—"assault" has a connotation of a more serious kind of attack or injury. I don't recall a description from the records of an attack that was noted in the detail where they said he did this, he really hurt somebody.

Q. Is it true that in the records they refer to a facility known as D.H.S. and indicate that no, excuse me, that he was placed at Wesleyan, W–E–S–L–E–Y–A–N and while there he instigated an assault involving a staff member?

A. It does indicate that he was—that's correct he was admitted there on February 22, 1989, dismissed on March 10th as being unacceptable to their program because of aggressiveness.

Q. And for example, while he was at St. Anthony's Hospital he couldn't be kept there because they didn't feel that they could treat him because of his aggressive behavior?

A. That's correct.

Q. He's described otherwise as intimidating and harassing other patients?

A. That's correct.

Q. Physically abusive to patients?

A. Again, that's my general recollection. I don't have that particular part of the chart in front of me.

Q. There's a reference that he was picked up on a string of armed robberies?

Tr. at 7777–82.

From there, the Government's questioning of Dr. Cunningham turned to the subject of psychopathy. Through the cross-examination of Dr. Cunningham, the Government was able to define psychopathy and describe the characteristics of a psychopath for the jury. Among the characteristics described were lack of remorse (Tr. at 7805), impulsivity (Tr. at 7805), poor behavioral control (Tr. at 7805), increased incidence of predatory violence (Tr. at 7807), increased risk of violent recidivism (Tr. at 7809), and not being amenable to treatment (Tr. at 7819). Ultimately, the Government, through Dr. Cunningham, advised the jury that Dr. *Ryan* had diagnosed Defendant Lee as a psychopath. Tr. at 7826.

### C. Examination of Dr. Ryan

Defendant Lee also raises the issue of whether Dr. Ryan's testimony was proper rebuttal. Prior to Dr. Ryan's testifying, the Court limited the scope of said testimony as follows:

THE COURT: ... I'm going to grant the Defendant Lee's motion in limine with respect to the issue of psychopathy, the Hare psychopathy test, and any reference to the defendant being a, quote,

psychopath, unquote, on the basis that such would not be proper rebuttal.

Tr. at 7836. Despite said ruling, the Court is troubled by several aspects of Dr. Ryan's direct testimony because of their focus on Defendant Lee's alleged violent nature.

Q. Did your examination suggest that Mr. Lee was a person who was suspicious?

A. Yes.

Q. Distrustful?

A. Yes.

Q. Angry?

A. Yes.

Q. There was a suggestion by Dr. Cunningham of a particular test you performed called an MMPI and that he talked about an elevated something, and he used the word "paranoia."

A. Yes.

Q. Could you explain what your tests showed in that area?

A. That test is a personality test. In fact, it's the most widely used personality test in the world, and it looks at a variety of personality features. It looks at anxiety, depression, psychopathic deviancy. It looks at heightened levels of energy, what we call mania. It also looks at someone's level of suspiciousness, and that is called paranoia scale. And he was slightly elevated on the paranoia scale . . . .

Tr. at 7917–18.

Q. You told us you talked to Mr. Lee about his life. For example, did you ask him how he became involved in the skinhead movement?

A. Yes, I did.

Q. What did he say?

A. He told me that he got involved because he could have sex with a lot of women, drink a lot of beer, and get in a lot of fights.

Q. Did you talk to Mr. Lee about fights?

A. Yes.

Q. It's not so much how much, but did he talk to you about why he fought?

A. Well, he told me that he drank a lot and would get himself in trouble, but that he enjoyed the fighting.

Q. He enjoyed it?

A. Yes. He liked the stimulation.

Q. Did he seem impulsive to you? Mr. Lee.

A. Yes, he did.

Q. Tell me what your thoughts were on that.

A. All right. There was an incident when some lunch trays were coming through, and the guard wouldn't let him have the lunch right away, and he immediately just jumped out of his chair and became extremely angry at the guard, arguing and using profanity as to why he couldn't get his lunch right then and there, and I thought that was a great example of impulsivity.

Tr. at 7919–20.

Q. Did he react to various people that would walk by?

A. Yes. It was striking the way that he reacted differently. For example, I noticed that when black guards and black inmates went by, he had a lot of negative things to say and used a lot of profanity, talking about things that they were doing in jail and that sort of thing that offended him.

On the other hand, when white guards were there, he was friendly as could be. He was waving, smiling. Same thing with other inmates when they were walking by. I thought that was rather striking. It was such a dichotomy.

Tr. at 7925.

### D. Impropriety of the Examinations

Upon reflection, the Court sees numerous problems in the Government's cross-examination of Dr. Cunningham and in Dr. Ryan's "rebuttal" testimony. First, with respect to Dr. Cunningham, the Court erred in ever assuming that the Government could properly make Dr. Cunningham its own witness on the subject of Defendant Lee's mental health. *See* Tr. at 7748. The Government had affirmatively

stated to Defendant Lee and the Court that it would not introduce mental health evidence in its case-in-chief. Thus, the Government was wrong to allow the Court to proceed on the mistaken assumption that, despite such representation, Dr. Cunningham could testify on the Government's behalf "as its witness." Equally, the Court was at fault for not noting that this would violate the representation made by the Government and in not acting promptly to nip the improper tactic in the bud. More important is the fact that Defendant Lee was entitled to notice of the aggravating evidence to be introduced against him so that he could prepare for his mitigation defense. The introduction of such aggravating evidence against Defendant Lee through his own mental health expert during his "defense" was fundamentally unfair in that Defendant Lee had no opportunity to respond thereto.

Second, the Government several times elicited testimony from Dr. Cunningham and Dr. Ryan regarding past bad acts of the Defendant that were not brought out in the Government's case-in-chief or in the direct examination of Dr. Cunningham. Examples include physical abuse of a girlfriend (Tr. at 7777), assault of his sister (Tr. at 7779–80), burglary and arson offenses (Tr. at 7780–81), assaulting inmates and patients at various facilities (Tr. at 7781), becoming violent in the lunch line (Tr. at 7920), and treating blacks differently than whites (Tr. at 7925). The Government even emphasized some of these factual instances to the jury in its closing argument. *See* Tr. at 7960, 7968. These factual instances were, pure and simple, aggravating evidence in support of future dangerousness and should have come in, if at all, in the Government's case-in-chief. Defendant Lee was entitled to notice that these factual instances would be offered

against him as well as an opportunity to defend against them before the jury.[4] However, because the Government introduced them through the "back door," Defendant Lee had no notice or meaningful opportunity to defend.

Third, and perhaps most importantly, the Government's cross-examination of Dr. Cunningham and its presentation of Dr. Ryan as a rebuttal witness focused far too much on Defendant Lee's tendency for violence and his purported diagnosis as a "psychopath." Dr. Cunningham's direct testimony focused exclusively on mitigation evidence. Dr. Cunningham put it best:

What I was trying to measure is what formative factors shaped him. I wasn't attempting to label just exactly what are we going to call him at this point, a dysthymic disorder, explosive disorder, antisocial personality disorder, is he borderline? I wasn't trying to label him with the conclusion. I was attempting to evaluate what factors were formative in nature, and so I structured my evaluation accordingly. I didn't do a lot of things that I would have done if I was trying to label him out here. I was attempting to look at how do we get here, what happened that brought us to this point.

Tr. at 7829.[5] The Government's questioning of Dr. Cunningham went well beyond the mitigation evidence raised by Dr. Cunningham on direct and ultimately became an expanded encore presentation of the Government's case for future dangerousness. Dr. Ryan's testimony also improperly focused on Defendant Lee's violent character traits. The Court erred in failing to restrain the Government in these respects despite Defendant Lee's insistence that the questioning was improper.[6]

---

4. The agreed instructions, indeed, set forth the evidence upon which the Government would rely to establish that "Daniel Lewis Lee would be a danger in the future to the lives and safety of other persons...." *See* pg. 1031, *infra.*

5. *See also* note 3, *supra.*

6. At the conclusion of Dr. Cunningham's testimony, the Court knew it had a made a mistake: "THE COURT: ... First, I am convinced that I probably permitted the Government to go much farther on cross-examination than is proper." Tr. at 7836.

As a result, Defendant Lee's rights were irreversibly compromised.

The Government argues that, because the defense explored Defendant Lee's violence on direct-examination, it opened the door to additional discussion of the nature of that violence. By analogy, the Government asserts that, if a doctor testifies that a patient is at risk for cancer, cross-examination should be permitted to determine whether the patient has cancer, and if so, how severe it is. If Defendant Lee's violence is the cancer used in the Government's analogy, then the cross-examination at issue was clearly improper. Essentially, the Government in its case-in-chief offered evidence that Defendant Lee has cancer, and it offered factual instances to support that allegation, such as a biopsy that revealed cancerous tissue. In putting on Dr. Cunningham as a mitigation witness, Defendant Lee for all intents and purposes admitted the cancer, but attempted to explain the cancer's presence by showing that it was a result of external factors. It does not follow that, on cross-examination, the Government could inquire into the nature or severity of the cancer. Defendant Lee had admitted to the cancer's presence, and Dr. Cunningham did not go into the nature or severity thereof. Rather, proper cross-examination should have been limited to the methods and techniques used by the doctor in arriving at his conclusions. Admittedly, this did not leave the Government with much room on cross-examination, but the Court must conclude that this was a product of a careful strategy on Defendant Lee's part in choosing to limit Dr. Cunningham's testimony as he did.

The Government's analogy also fails with respect to Dr. Ryan's rebuttal testimony. Dr. Ryan did not look at the same factors in Defendant Lee's life as Dr. Cunningham did. To the contrary, Dr. Ryan's evaluation of Defendant Lee focused almost entirely on risk assessment evidence. Thus, many of the opinions Dr. Ryan had to offer on Defendant Lee were improper rebuttal. As the Court said during the sentencing hearing:

> THE COURT: If they are both looking at the same thing and come up with a different diagnosis, I think you are right, but if one of them is looking at one thing and one of them is looking at something else and says these factors indicate cancer and the other one says these factors indicate pneumonia then the trains miss.

Tr. at 46 (May 13, 1999, Volume 46, under seal).[7]

The Government incorrectly relies on portions of Dr. Cunningham's direct testimony as justification for its cross-examination. It cites the following passage from the doctor's direct testimony as evidence that Dr. Cunningham addressed the issue of remorse, thus opening the door for exploration of that issue on cross-examination:

> Here they are diagnosing him with an intermittent explosive disorder. That means that the person goes along and then has an outburst of anger and rage that's much out of proportion to the stimulus, to the situation that should be causing, then often afterwards feels kind of embarrassed or ashamed or regretful about what happened there.

Tr. at 7730. When placed in context, it is clear that Dr. Cunningham was not referring to his *own* opinion or diagnosis of Defendant Lee but, rather, he was reciting the diagnosis and opinion of some other doctor or expert who had seen the Defendant during his teenage years. The Government did not choose to bring such other experts to testify in its own case, and those experts therefore were not subject to cross-examination. The unfairness is patent.

Turning to the issue of the Government's cross-examination on the subject of psychopathy, it is clear that this evidence was improper. While the psychopath evidence may, to a certain extent, have been

*See* note 3, *supra*.

proper cross-examination as it was an alternate explanation for the Defendant's alleged violence, the presentation of the psychopath evidence turned into future dangerousness and risk assessment evidence, thus going beyond the scope of proper cross-examination.

The Government contends that it was Dr. Cunningham who first raised the issue of psychopathy on direct:

> DR. CUNNINGHAM: For example, if somebody is a *psychopath*, that's down at one end of the continuum. At the other end of the continuum is a borderline personality disorder. Both of them have attachment problems. This guy doesn't attach at all. This one attaches, but in an unstable and tense way. So they are both attachment disorders, different ends of the continuum.

Tr. at 7729 (emphasis added). Here, Dr. Cunningham was reviewing for the jury the Defendant's psychiatric records from the Oneida Baptist Institute when the Defendant was fifteen years old. The records indicated a "rule out of borderline personality disorder." Tr. at 7728. Dr. Cunningham was, in the quoted passage where he mentions a "psychopath," trying to explain a borderline personality disorder to the jury. The doctor did not offer any opinion or diagnosis of Defendant Lee on the subject of borderline personality disorder or psychopathy. It can hardly be said that the doctor's mere mention of the word "psychopath" opened the issue for intense cross-examination by the Government.

Although it did not register to the Court at the time, it now appears that from the outset, the Government intended to use Defendant Lee's mental health evidence as part of its own case for future dangerousness. In opening statements, the Government stated:

> MR. LIROFF: ... The evidence that will be presented in this trial is going to

help you understand that Mr. Lee, this man who sits right here in this courtroom, is a violent and dangerous man. He thrives on this stuff. *That is part of his profile.* Even if you sent him to prison for the rest of his life, he will be a threat for a long, long time.

> In the end, what the evidence that will be presented will establish is that *Mr. Lee is a psychopath.* I don't mean that in a common term. I do mean that in the medical use.

> \* \* \* \* \* \*

> We will prove in this case to you that Mr. Lee, *because of his psychological profile,* who he is and who he will be for years to come, is dangerous and will continue to be dangerous.

Tr. at 7381, 7383 (emphasis added). In questioning Dr. Cunningham, the Government highlighted to the jury that psychopathy is a clear indication of future dangerousness:

> Q. And do you agree with their statement that the Hare psychopathy check list is the single most promising recent development in risk assessment of correctional and forensic populations, has been the psychopathy check list revised. Do you agree with that?

> \* \* \* \* \* \*

> Q. Is it fair to say that the psychopathy check list serves a purpose other than violence assessment, violence risk assessment?

Tr. at 7812.

Introduction of the psychopathy evidence was error because it improperly emphasized Defendant Lee's future dangerousness. Defendant Lee chose neither to perform a risk assessment analysis nor to present rebuttal evidence on the future dangerousness aggravating factor. He was therefore ill-equipped to handle the Government's discussion of psychopathy.[8]

---

**8.** As Defendant Lee states in his reply brief, "Had Dr. Cunningham and the defense made the decision to address future dangerousness and risk assessment, Dr. Cunningham would

have explained to the jury how the BOP handles violence and violent offenders within its system." Reply Brief, Doc. No. 856, at 3.

In failing to restrict the Government's statements and inquires regarding psychopathy more than it did, the Court erred, and, as a result, Defendant Lee did not receive a fair sentencing hearing.

In sum, it is now apparent from the Government's opening statement and the brevity of its own direct case on the issue of future dangerousness that the Government intended from the beginning to make its most compelling showing of future dangerousness through its cross-examination of Dr. Cunningham and its "rebuttal" testimony of Dr. Ryan. Hence, the Court must ask: Would this jury have given Defendant Kehoe life without parole and Defendant Lee the death penalty if: 1) the Government had not used Dr. Cunningham at all, or, 2) if the Government had not been permitted to open up an area on cross-examination that Dr. Cunningham had not addressed during direct-examination? The Court concludes that it is very questionable whether the jury would have given Defendant Lee the death penalty based upon the Government's direct case, a properly confined cross-examination of Dr. Cunningham, and a properly limited rebuttal by the Government.

■ The Government also clearly exceeded the proper scope of evidence permitted by the Court's instruction on the non-statutory aggravating factor of "future dangerousness." That instruction states:

The non-statutory aggravating factor alleged by the Government is that Daniel Lewis Lee would be a danger in the future to the lives and safety of other persons, as evidenced by:

(a) his involvement in the murder of Joseph John Wavra on or about July 24, 1990, in Oklahoma City, Oklahoma;

(b) misdemeanor conviction of carrying a concealed in [sic] weapon in Martin County, Florida, on May 3, 1995; and

(c) lack of remorse, as evidenced by his statements made to Gloria Kehoe. You are not being asked, nor are you permitted, to impose any form of punishment for the activities described above. You are only asked to consider whether the activities described above prove beyond a reasonable doubt that Daniel Lewis Lee would be a danger in the future to the lives and safety of other persons.

Docket No. 815. This instruction specifically limited the evidence the Government was permitted to introduce in support of this aggravating factor.

In its June 22, 1999 brief captioned "Government's Brief Regarding Alleged Punishment Phase Error, Supplemental," the Government notes that the above instruction, as given to the jury in Defendant Lee's penalty phase trial, did not list the threat allegedly made by Defendant Lee against the Pulaski County Deputy Sheriff as an evidentiary basis for supporting the non-statutory aggravator for future dangerousness although the Court had specifically granted the Government's earlier motion to include that threat. The Government is correct in that assertion.

The instructions utilized by the Court were submitted before or during the guilt phase of the trial and were agreed to by the parties. The actual punishment phase instructions were submitted to both the Government and the Defendant immediately before the penalty phase argument, and neither party noted this omission. The Government was permitted to put on evidence of the threat during the penalty phase of the trial. The Government concludes its argument on this point as follows:

If the jurors had been correctly instructed, they would have been permitted to consider the threat Lee made against the deputy sheriff. Because the instructions prevented the jury from effectively considering the threat, the only party disadvantaged by this error, was the Government.

Docket No. 939 at pgs. 4–5. Because the Court permitted evidence of the threat to the deputy sheriff to be introduced and argued, it is likely that the jury took that evidence into consideration in spite of the omission in the instructions. Neverthe-

less, upon retrial, this mistake can be corrected. The main point here, however, is that the accuracy and specificity with which the permitted evidence supporting non-statutory aggravating factors are set forth in the instructions will not prevent unfairness if the Court's evidentiary rulings let in proof that goes beyond the evidence specified.

Accordingly, the Court concludes that it was error to allow the introduction of the aforementioned evidence regarding future dangerousness during the penalty phase of Defendant Lee's trial. The implications of this ruling and its possible interaction with the Court's ruling on the Protocol issue will be discussed at the conclusion of this Order.

### DEATH PENALTY PROTOCOL

#### I. Background

On May 4, 1999, a jury convicted Defendants Chevie Kehoe and Danny Lee of several RICO offenses involving *inter alia* the robbery and murder of the Mueller family in Tilley, Arkansas.[9] Shortly thereafter, separate penalty phase trials were scheduled for the two Defendants. Defendant Kehoe's penalty trial occurred first. On May 10, 1999, immediately before the penalty verdict was returned in Defendant Kehoe's case, the Government announced *in camera* that if the jury sentenced Defendant Kehoe to life imprisonment, it would not pursue the death penalty for Defendant Lee. May 10, 1999 Transcript (under seal) at 3–6, (Docket No. 824). The Government then explained that it would

have to contact the Department of Justice ("DOJ") to obtain permission to withdraw or decertify the death penalty notice. *Id.*

Around 10:45 a.m., the jury sentenced Defendant Kehoe to life imprisonment without the possibility of parole. Accordingly, the Government again indicated during a second *in camera* conference that it would contact the DOJ and request permission to decertify or withdraw the death penalty notice for Defendant Lee. May 10, 1999 Transcript (under seal) at 2–7, (Docket No. 825). The Court then asked the Government if it would be able to do so by noon, but the Government requested more time. *Id.* It was then decided that the Court would meet with counsel at 3:00 that afternoon. *Id.*

The parties reconvened in chambers at 3:00 p.m. *Id.* at 7. When the Court asked the United States Attorney, Ms. Paula Casey, whether the Government intended to seek the death penalty for Defendant Lee, she responded, "I've not spoken with the Attorney General, but with the Deputy Attorney General. The Department is not decertifying the death request." *Id.* at 8. The parties then announced that they were ready to proceed with the penalty phase of the trial the following morning. *Id.* Importantly, at no time did the Government ask for additional time to deal with the requested decertification of the death penalty for Defendant Lee. If such request had been made, this Court would naturally have granted it. The penalty phase of Defendant Lee's trial commenced the next

9. The Government has maintained throughout the pre-trial, trial and post-trial periods that Chevie Kehoe was the leader of the RICO enterprise and that Danny Lee and others were his subordinates. The proof at trial was consistent with those contentions. In fact, Defendant Lee was implicated in only a few of the numerous RICO acts alleged in the Indictment, and he was acquitted of at least two of the acts in which he was implicated. To be sure, he was found guilty of the RICO acts relating to the robbery and murders of the Mueller family, but even with respect to those crimes, the testimony was that Defendant Lee played a lesser role in their planning and commission. With respect to the murder of Sarah Powell, the principal testimony offered to establish the details of the crime was that of Chevie Kehoe's mother, Gloria Kehoe. Ms. Kehoe testified that she was told by Chevie Kehoe that Danny Lee could not participate in that murder and that he (Chevie Kehoe) had to carry it out alone. Moreover, the proof as a whole left the definite impression that Defendant Kehoe was the orchestrator of the entire RICO operation, and that Defendant Lee served as his subordinate for only a brief portion of the lengthy multi-state conspiracy.

morning, at the conclusion of which, the jury returned with a verdict of death.

Defendant Lee subsequently asked that the verdict be set aside because the Attorney General failed to follow the Death Penalty Protocol ("Protocol"), which is set forth in § 9–10.000 et seq. of the United States Attorney's Manual ("Manual"). That Protocol requires the Attorney General to make the final decision whether to decertify or withdraw a death penalty notice.[10] The relevant provision of the Protocol provides that:

> Once the Attorney General has authorized the United States Attorney to seek the death penalty, a notice of intention to seek the death penalty filed with the court shall not be withdrawn *unless authorized by the Attorney General* or approved by the United States Attorney as a condition of a plea agreement. If the United States Attorney wishes to withdraw the notice and proceed to trial, the United States Attorney shall Advise the Assistant Attorney General for the Criminal Division of the reason for that request, including the changes in facts or circumstances.
>
> Any request to withdraw a notice shall be reviewed by the Committee [known as the Review Committee on Capital Cases] appointed by the Attorney General, which will make a recommendation to the Attorney General. *The Attorney General shall make the final decision.*

United States Attorney's Manual § 9–10.090 (emphasis added).

In response to Defendant Lee's allegations, Mr. Robert A. De La Cruz, an attorney for the Department of Justice, sent the Court a letter explaining that:

10. Defendant Lee does not contend that the Government failed to follow the Protocol when it initially obtained the Attorney General's permission for seek the death penalty for Defendant Lee.

11. The Court takes strong exception to Mr. De La Cruz's suggestion that it is responsible for the U.S. Attorney's inability to obtain a decision on this most serious issue. At the time, the Court was unaware of the Protocol, and

The United States Attorney was required to seek *the Attorney General's authorization* to withdraw the notice of intent to seek a death penalty. The United States Attorney attempted to do that, after consultation with members of this trial team. The Attorney General was unavailable during the time allotted to the government by the Court, and *Deputy Attorney General Eric Holder decided* not to withdraw the Attorney General's previously-given authority to seek the death penalty. The Attorney General did not authorize the United States Attorney to withdraw the notice of intent to seek the death penalty. Accordingly, the United States was compelled to proceed with the sentencing phase of defendant Lee's trial, and the trial attorneys were under a continuing obligation to represent the interests of the Unites States, without regard to personal views.

Docket No. 840 at 9–10 (emphasis added).[11] The Government also submitted the affidavit of Mr. Kevin V. DiGregory, who was the member of the Attorney General's Review Committee on Capital Cases that received U.S. Attorney Casey's May 10, 1999, telephone call requesting permission to withdraw the death penalty notice for Defendant Lee. In his affidavit, Mr. DiGregory averred that:

4. At the time of Ms. Casey's telephone call to me, Attorney General Janet Reno was attending a meeting at the White House in Washington, D.C. Until such time as Attorney General Reno returned to her office at the Department, she was unavailable to decide the issue posed by United States Attorney

the procedures contained therein for obtaining permission to withdraw a death penalty notice. If the Court had been so advised and a request for an extension of time had been made, this Court would have certainly granted the parties' request in order to permit the Attorney General to personally attend to this most serious matter as provided in that Protocol. Indeed, continuing the penalty phase for a day or two, if necessary, would not have created more than a minor inconvenience.

Casey. Since the Attorney General was not available, *we sought out Deputy Attorney General Eric H. Holder, Jr., as the decision-maker* because I was concerned about affording the decision-maker sufficient time to meet with the Committee, confer with the United States Attorney Casey, and make a decision prior to the 3:00 p.m. CDT deadline.

5. At approximately 2:30 p.m. EDT [12], the Committee met with Deputy Attorney General Holder and, via telephone, with the United States Attorney Casey. In the course of that meeting, *Deputy Attorney General Holder decided* that the notice of intention to seek the death penalty should *not* be *withdrawn*, and that decision was communicated to United States Attorney Casey.

Docket No. 887 (emphasis added).[13]

Defendant Lee then subpoenaed Attorney General Reno and Deputy Attorney General Holder in an effort to further determine what transpired on May 10, 1999, and the Government filed a Motion to Quash those subpoenas. This Court denied the Government's Motion on July 22, 1999. Docket No. 885. In that Order, this Court ruled that the subpoenas were necessary to determine: 1) Attorney General Reno's whereabouts on May 10, 1999; 2) the extent of her knowledge of, or participation in, the Protocol; 3) whether Defendant Lee had an adequate opportunity to be heard; 4) whether a recommendation was in fact made by the Committee; 5) whether the recommendation was conveyed to the individual vested with "final" authority; 6) whether Attorney General Reno was "legally absent" on that date; 7) whether Attorney General Reno specifically authorized Deputy Attorney General Holder to act in her stead in this case; and

8) whether, after the fact, Attorney General Reno reviewed the procedures and the decision of Deputy Attorney General Holder and approved or disapproved of the procedures used and with his ultimate decision to seek the death penalty. *Id.*

After the Order was entered, the Government filed a Petition for a Writ of Mandamus asking the Eighth Circuit to prevent the issuance of the subpoenas. The Eighth Circuit granted the petition because of its decision that Defendant Lee failed to establish "exceptional circumstances" justifying the issuance of subpoenas to high government officials, such as the Attorney General and her Deputy. *See In re United States of America,* 197 F.3d 310 (8th Cir.1999).[14] During oral arguments before the Eighth Circuit, Defendant Lee conceded that in order to prevail on his motion to set aside the death verdict, he need only establish that: "Reno did not participate in or approve the decision not to withdraw the death notice in this case, that Reno did not know of Casey's request to withdraw the notice, and that *the death penalty protocol was not followed.*" *Id.* at 314 (emphasis added). So, in addition to a lack of exceptional circumstances, the Eighth Circuit reasoned that the Reno and Holder subpoenas were unnecessary because "[t]he record as developed at the June 29 hearing and in the DiGregory affidavit contains sufficient evidence *to establish each of these facts,* none of which appears to be disputed by the government." *Id.* (emphasis added).

Accordingly, this Court will now presume that the Protocol, as stated in United States Attorney's Manual § 9–10.090, was in fact violated because Attorney General Reno did not participate in, or approve of,

**12.** Which would be 1:30 CDT.

**13.** The Protocol requires that the request to withdraw the death penalty notice "shall be reviewed by" the Review Committee on Capital Cases, and that the Committee "will make a recommendation to the Attorney General." U.S. Attorney's Manual § 9–10.090. Mr. DiGregory's affidavit does not state whether the Committee reviewed the request, or if the

Committee made any recommendation thereon to the Attorney General.

**14.** Defendant Lee has filed a petition for a writ of certiorari asking the United States Supreme Court to review that decision. The Court has decided, with the parties' permission, to go forward with this matter without waiting for the Supreme Court's decision.

Deputy Attorney General Holder's decision not to withdraw the death penalty notice, and further, she did not even know of the U.S. Attorney's request to withdraw the notice at anytime before that decision was made and conveyed to this Court. Furthermore, although Defendant Lee has not been permitted to establish this as a fact (because of the decision by the Eighth Circuit), this Court will assume that the Attorney General could easily have been contacted [15] about this serious issue before 3:00 p.m. on May 10, 1999, and that, in any event, time was not a factor because the parties could have requested and received additional time to accommodate the convenience of Attorney General Reno. Hence, this Court must now resolve the issues of: 1) whether Defendant Lee has a right to enforce compliance with the procedures found in the Protocol before the Attorney General makes the final decision on the U.S. Attorney's request to decertify the death penalty notice in this case; and 2) whether, under the circumstances stated, Deputy Attorney General Holder had authority to act in Attorney General Reno's stead.[16]

## II. Discussion

### A. Right to Enforce the Protocol

 The first issue this Court must resolve is whether Defendant Lee has a right to enforce compliance with the procedures found in Attorney General Reno's Death Penalty Protocol. When considering the Government's petition for mandamus, the Eighth Circuit seemed to surmise, in dicta, that perhaps Defendant Lee had no such right. *See In re United States of America*, 197 F.3d at 315–16. Upon careful consideration, this Court respectfully dis-

---

**15.** This Court's conclusion that Attorney General Reno could have been easily contacted is bolstered by a former Committee member's statement that, "[t]he Review Committee operates informally, with no set schedule and with *virtually immediate access to the Attorney General when necessary.*" Rory K. Little, *The Federal Death Penalty: History and Some Thoughts About the Department of Justice*, 26 FORDHAM URB. L.J. 347, 421 (1999) (emphasis added).

**16.** Defendant Lee argues that Congress gave the United States Attorney, and not the Attorney General, the authority to decide whether to seek the death penalty in a particular case. The relevant provision of the Federal Death Penalty Act provides that:

If, in a case involving an offense described in section 3591, *the attorney for the government* believes that the circumstances of the offense are such that a sentence of death is justified under this chapter, the attorney shall, a reasonable time before the trial or before acceptance by the court of a plea of guilty, sign and file with the court, and serve on the defendant, a notice [to seek the death penalty] . . . .

18 U.S.C. § 3593(a)(emphasis added). The Act does not define the phrase "attorney for the government," but the Court agrees with the court in *Nichols v. Reno*, 124 F.3d 1376 (10th Cir.1997), as will be explained herein, that the quoted language refers to United States Attorneys.

Generally, the duty to "prosecute for all offenses against the United States" is allocated to the United States Attorneys. 28 U.S.C. § 547(a). However, the same title specifically gives the Attorney General the authority to "*supervise all litigation* to which the United States, an agency, or officer thereof is a party, and *shall direct all United States attorneys*, assistant United States attorneys, and special attorneys appointed under section 543 of this title *in the discharge of their respective duties.*" 28 U.S.C. § 519. The Tenth Circuit has interpreted these three statutory provisions as giving the Attorney General the authority to enact the Protocol which, in turn, gives her, and not the United States Attorneys, the final decision whether to seek the death penalty in a particular case. *See Nichols*, 124 F.3d at 1377 (10th Cir.1997) (affirming the same conclusion reached by the District Court of Colorado in *Nichols v. Reno*, 931 F.Supp. 748, 750 (D.Col.1996)).

The Court agrees with this reasoning, and therefore, rules that Attorney General Reno, and not United States Attorney Casey, has the authority to make the final decision whether to seek the death penalty in Defendant Lee's case. Nevertheless, this is a serious issue since, absent the adoption of the Protocol or some other directive or intervention by the Attorney General, exercise of this responsibility would be vested in the U.S. Attorneys involved and the decision of United States Attorney Casey here would have resulted in the withdrawal of the death penalty notice in Defendant Lee's case.

agrees. The basic premise from which the Eighth Circuit rightfully began its analysis is the *Accardi* doctrine, which, in sum, provides that an administrative agency must follow its own procedural rules if those rules will affect an individual's rights. *See Accardi v. Shaughnessy,* 347 U.S. 260, 74 S.Ct. 499, 98 L.Ed. 681 (1954). Because the *Accardi* doctrine cases are particularly applicable to the facts at hand, they warrant considerable discussion.

In *Accardi,* section 19(c) of the Immigration Act of 1917 gave the Attorney General discretion to suspend the deportation of an illegal alien if certain criteria were established. *Id.* at 262–633, 74 S.Ct. 499. The Attorney General, however, passed regulations that delegated this discretionary decision to the Board of Immigration Appeals.[17] *Id.* at 266, 74 S.Ct. 499. The respondent, Mr. Accardi, argued that the decision to deport him was invalid because the Board and the Attorney General failed to follow the procedures mandated by those regulations. *Id.* at 266–67, 74 S.Ct. 499. The Supreme Court held that although Mr. Accardi did not have the right to interfere with the Board's or the Attorney General's discretion by questioning their *ultimate and substantive* decision to deport him, he did have a right to require them to follow their self-imposed procedures when making that determination. *Id.* In this respect, the Court explained:

> It is important to emphasize that we are not here reviewing and reversing the manner in which discretion was exercised. If such were the case we would be discussing the evidence in the record supporting or undermining the alien's claim to discretionary relief. Rather, we object to the Board's alleged failure to exercise its own discretion, contrary to valid regulations.

*Id.* at 268, 74 S.Ct. 499. Hence, the Court ruled that if Mr. Accardi could establish that the procedures were in fact violated,

he would be entitled to a new deportation hearing. *Id.*

The *Accardi* doctrine was further expanded during the McCarthy era when actions were taken against individuals for their alleged association with the Communist party. For example, in *Service v. Dulles,* 354 U.S. 363, 370, 77 S.Ct. 1152, 1 L.Ed.2d 1403 (1957), a statute commonly referred to as the "McCarran Rider" gave the Secretary of State "absolute discretion" to terminate any employee of the Department of State or of the Foreign Service "whenever he shall deem such termination necessary or advisable in the interests of the United States" (quoting Pub.L. No. 82–188, § 103, 65 Stat. 581). The Secretary of State, however, enacted self-imposed regulations that established an elaborate procedure to be followed when deciding whether to terminate an employee for disloyalty. *Id.* at 383–87, 77 S.Ct. 1152. The petitioner, Mr. Service, argued that pursuant to *Accardi,* the Secretary's decision to terminate him was invalid because the Secretary did not follow the procedures mandated by those regulations. *Id.* at 372, 77 S.Ct. 1152. The Supreme Court agreed and gave the following explanation:

> While it is of course true that under the McCarran Rider the Secretary was not obligated to impose upon himself these more rigorous substantive and procedural standards, neither was he prohibited from doing so, as we have already held, and having done so he could not, so long as the Regulations remained unchanged, proceed without regard to them.

*Id.* at 388, 77 S.Ct. 1152. Accordingly, the Court invalidated the Secretary's decision to terminate Mr. Service and remanded the case for further consideration. *Id.* at 388–89, 77 S.Ct. 1152.

Over the next six years, the Supreme Court held in other McCarthy era cases that an individual had the right to force an agency to comply with its self-imposed procedural rules or regulations when mak-

---

**17.** The Board's decision was reviewable by the Attorney General only in certain circumstances listed in 8 C.F.R § 90.12 (1949) and 8 C.F.R. § 6.1(h)(1) (Rev.1952). *Id.* at 266.

ing a substantive and discretionary decision. *See Yellin v. United States,* 374 U.S. 109, 83 S.Ct. 1828, 10 L.Ed.2d 778 (1963)(holding that an individual had the right to force the House Committee on Un–American Activities to abide by its own procedural rules during an investigatory hearing); *Vitarelli v. Seaton,* 359 U.S. 535, 79 S.Ct. 968, 3 L.Ed.2d 1012 (1959)(holding that, although Congress gave the Secretary of Interior absolute discretion to terminate an employee in the name of national security, the Secretary was nevertheless required to follow its own procedural rules when making such a determination).

Finally, and most relevant here, is the case of *Morton v. Ruiz,* 415 U.S. 199, 94 S.Ct. 1055, 39 L.Ed.2d 270 (1974), where the Supreme Court held that the *Accardi* doctrine also applied to procedural rules found in an agency's *internal manual.* In *Morton,* the Bureau of Indian Affairs ("BIA") denied the respondents' request for general assistance benefits because the respondents failed to satisfy a geographic limitation promulgated by the Bureau. *Id.* at 205, 94 S.Ct. 1055. On appeal, the respondents claimed that the geographic regulation was invalid because it was not published in the Federal Register or Code of Federal Regulations as required by the Bureau's "internal-operations brochure." *Id.* at 235–36, 94 S.Ct. 1055. The Supreme Court held that the geographic limitation was invalid, not because of the substance of that regulation, but because the BIA failed to publish it in compliance with their self-imposed rule requiring them to do so. *Id.* In reaching this conclusion, the Court said:

> Where the rights of individuals are affected, *it is incumbent* upon agencies to follow their own procedures. This is so

even where the *internal procedures* are possibly *more rigorous* than otherwise would be required.... Before the BIA may extinguish the entitlement of these otherwise eligible beneficiaries, it must comply, at a minimum, with its own *internal procedures.*

*Id.* at 235, 94 S.Ct. 1055 (internal citations omitted)(emphasis added).

Likewise, the Eighth Circuit has held on numerous occasions that pursuant to the *Accardi* doctrine an agency must follow its self-imposed procedural rules when making discretionary decisions that affect an individual's rights. *See, e.g., Munnelly v. United States Postal Serv.,* 805 F.2d 295, 302 (8th Cir.1986) (acknowledging that the Postal Service had to abide by its self-imposed procedural rules, which were printed in an internal postal manual, when deciding whether to terminate an employee); *Oglala Sioux Tribe v. Andrus,* 603 F.2d 707, 721 (8th Cir.1979) (recognizing that an Indian tribe must follow its own procedural rules before transferring a superintendent).

From these cases, it is abundantly clear that an individual has the right to force an administrative agency [18] to follow its own procedural rules, even when those rules are contained in an internal manual and are more stringent than the broad authority given to that agency, if the decision made under those rules will affect the individual's rights. In the aforementioned cases, the courts applied this doctrine when the individual rights affected were citizenship, employment, and eligibility for general assistance benefits. In the present case, the right affected is the most fundamental right—the right to life. Hence, this Court concludes that because Defendant Lee's right to life will be affected [19] by the Attorney General's decision

**18.** It is undisputed that the Department of Justice is an executive agency. *See also Walker v. Reno,* 925 F.Supp. 124, 126 (N.D.N.Y. 1995) (holding that the DOJ is an executive agency).

**19.** In a law review article written by a former member of the Attorney General's Capital

Case Review Committee, the author explains that:

> The U.S. Attorney's recommendation carries great, although not dispositive, weight with the Committee. This is particularly so when the recommendation is *against seeking death* in death-eligible case. Such "no death" recommendations are *almost always*

whether to withdraw or decertify the death penalty notice, he has a right to require the Attorney General to follow her self-imposed procedures found in the Protocol before she makes that substantive decision. This Court wishes to emphasize, as the Supreme Court did in *Accardi*, that this ruling in no way impinges upon the Attorney General's broad discretion to make this *substantive* decision yea or ney, as she alone decides in this case. Although this Court does not have the authority to review, or look behind, the Attorney General's ultimate decision, the aforementioned cases clearly establish that this Court can require her to follow her *procedural* Protocol before making that decision.

In reaching this conclusion, the Court is not unmindful of the Government's assertion that the Attorney General and her U.S. Attorneys are somehow exempt from the *Accardi* doctrine because it is impermissible for a court to impinge upon their broad prosecutorial discretion. As illustrative of this point, the Government points to several Eighth Circuit cases holding that the accused has no right to enforce the Petite Policy,[20] which, similar to the Death Penalty Protocol, is an internal policy found in the U.S. Attorney's Manual. *See, e.g., United States v. Basile*, 109 F.3d 1304, 1308 (8th Cir.1997), *cert. denied*, 522 U.S. 873, 118 S.Ct. 189, 139 L.Ed.2d 128 (1997); *United States v. Les-*

ter, 992 F.2d 174, 176 (8th Cir.1993); *United States v. Moore*, 822 F.2d 35, 38 (8th Cir.1987). However, the Government's argument is flawed because in each of those cases the accused tried to challenge the Government's *ultimate and substantive* decision whether to pursue a successive prosecution instead of the procedures the DOJ followed when making those decisions. In fact, unlike the Death Penalty Protocol, the Petite Policy contains no procedural components.

The Government, however, is correct that other jurisdictions have held that defendants do not have a protected interest in the Death Penalty Protocol. *See United States v. Feliciano*, 998 F.Supp. 166 (D.Conn.1998); *United States v. McVeigh*, 944 F.Supp. 1478 (D.Colo.1996); *Nichols v. Reno*, 931 F.Supp. 748 (D.Colo.1996), *aff'd*, 124 F.3d 1376 (1997);*United States v. Boyd*, 931 F.Supp. 968 (D.R.I.1996), *cert. denied*, —— U.S. ——, 120 S.Ct. 842, 145 L.Ed.2d 708 (2000); *United States v. Roman*, 931 F.Supp. 960 (D.R.I.1996), *cert. denied*, —— U.S. ——, 120 S.Ct. 960, 145 L.Ed.2d 833 (2000); *Walker v. Reno*, 925 F.Supp. 124 (N.D.N.Y.1995). Again, these cases are factually distinguishable from the case at hand.

For instance, in the cases arising out of the bombing of the Oklahoma City federal building, the courts rejected Defendant Nichols' and McVeigh's substantive chal-

---

*accepted*, not just because of the traditional autonomy of the U.S. Attorneys, but also because the U.S. Attorneys generally exercise great care in submitting their recommendations and are presumed to know their local communities, jury pools, judges, and the overall strengths and weakness of their particular case far better than Main Justice personnel. . . . On the other hand, a *recommendation from a U.S. Attorney in favor of seeking the death penalty receives somewhat less deference at Main Justice*. Here is where the goal of national uniformity in administering the federal death penalty often outweighs the localized perspective of field offices.
Rory K. Little, *The Federal Death Penalty: History and Some Thoughts About the Department of Justice's Role*, 26 FORDHAM URB.

L.J. 347, 422–23 (1999) (emphasis added). In light of this proclamation, it is readily apparent that Defendant Lee's right to life was adversely affected by the DOJ's failure to follow its procedural Protocol when considering the U.S. Attorney's recommendation to decertify the death penalty notice in this case.

**20.** The Petite Policy provides that U.S. Attorneys shall not prosecute any person for allegedly criminal behavior that was an ingredient of a previous state prosecution, unless the subsequent federal prosecution is specifically authorized in advance by the "appropriate Assistant Attorney General." *See* U.S. Attorney's Manual § 9–2.031. The Petite Policy also establishes three substantive criteria the Assistant Attorney General must consider when making that determination. *Id.*

lenges to Attorney General Reno's ultimate decision to seek the death penalty. *McVeigh,* 944 F.Supp. 1478; *Nichols,* 931 F.Supp. 748. Importantly, in those cases the DOJ *had in fact followed the procedures mandated by the Protocol,* and hence such procedural compliance was not an issue. *See McVeigh,* 944 F.Supp. at 1483.[21] Likewise in *Feliciano, Boyd,* and *Roman,* the defendants asked the courts to force the Government to disclose the mitigating and aggravating factors provided to the Attorney General's Capital Case Review Committee even though no such procedural rights were found in or mandated by the Protocol. *Feliciano,* 998 F.Supp. 166; *Boyd,* 931 F.Supp. 968; *Roman,* 931 F.Supp. 960. Hence, this Court concludes that these cases have no bearing on its conclusion that Defendant Lee has a right to require the DOJ and the Attorney General to follow their procedural Protocol when making the substantive decision whether or not to seek the death penalty in his case.

Finally, and most persuasive, is the case of *Walker v. Reno,* 925 F.Supp. 124 (N.D.N.Y.1995). In that case, the court concluded, as does this Court, that a defendant does not have a right to challenge the Attorney General's *ultimate and substantive decision* to seek the death penalty. However, the *Walker* court declared, albeit in dicta, that pursuant to the *Accardi* doctrine, a defendant would have a right to force the DOJ and the Attorney General to follow the *procedural Protocol* found in the DOJ Manual. On this matter, the Court explained:

> In this case, plaintiffs' Complaint contains no allegation that defendant Reno ignored the procedures contained in her Protocol. Indeed, from all appearances defendant Reno scrupulously followed her self-prescribed Protocol procedures. Plaintiff has not alleged, for instance, that the U.S. Attorney sought the death

penalty without the prior written authorization of the Attorney General, Protocol at § 9–10.000(A), or failed to submit a prosecution memorandum to the Attorney General, *Id.* at § 9–10.000(A); or that plaintiff's counsel were denied a reasonable opportunity to present matters in opposition to capital punishment to the U.S. Attorney and DOJ, *Id.* § 9–10.000(B), (D); or that the Attorney General failed to appoint a special committee to review all submissions, *Id.* § 9–10.000(D), or failed to receive a recommendation from that committee. *Id.* Under the foregoing cases, such allegations might well provide a basis for this Court to set aside defendant Reno's determination and remand the matter to the Attorney General for reconsideration pursuant to the procedures she has prescribed for herself in the Protocol.

*Walker,* 925 F.Supp. at 132–33 (emphasis added)(footnotes omitted).

Based on the foregoing analysis, this Court concludes that pursuant to the *Accardi* doctrine, Defendant Lee has a right to require the DOJ and the Attorney General to comply with its self-imposed and internal procedures found in the Death Penalty Protocol before the Attorney General makes the final substantive decision whether to decertify the death penalty notice in his case.

## B. Deputy Attorney General Holder's Authority to Act

Hence, this Court must now decide whether the Protocol was in fact violated on May 10, 1999, when the U.S. Attorney submitted her decertification request to the Attorney General's Office. In light of the Eighth Circuit's holding, as explained above, this Court must assume that the Protocol was in fact violated because Attorney General Reno did not participate in, or approve of, Deputy Attorney General Holder's decision not to withdraw the

---

**21.** Instead, Defendants McVeigh and Nichols claimed that the Attorney General's ultimate and substantive decision to seek the death penalty was invalid because she publicly announced her decision to do so before a sus-

pect was even identified, and that her decision was improperly influenced by President Clinton's public pledge that the death penalty would be sought. *McVeigh,* 944 F.Supp. at 1483; *Nichols,* 931 F.Supp. at 750.

death penalty notice, and further, she did not even know of the U.S. Attorney's request to withdraw the notice at anytime before that decision was made and conveyed to this Court. In response to these assumptions, the Government argues that the Protocol was not violated because, under the circumstances of this case, Deputy Attorney General Holder had the authority to act in Attorney General's stead and make the ultimate decision to not withdraw the death penalty notice as to Defendant Lee. This Court disagrees for two reasons.

■ First, this Court concludes that Deputy Attorney General Holder did not have the authority to make the final decision on the U.S. Attorney's request to decertify the death penalty notice for Defendant Lee because Attorney General Reno was not legally absent. Congress anticipated that there might be some instances where the Deputy Attorney General might need to act on behalf of the Attorney General. Accordingly, Congress passed an act that provides, in relevant part, that: "In case of a vacancy in the office of Attorney General, or of his *absence* or disability, the Deputy Attorney General may exercise all the duties of that office, and for the purpose of section 3345 of title 5 the Deputy Attorney General is the first assistant to the Attorney General." 28 U.S.C. § 508(a) (emphasis added). Likewise, the relevant regulation declares that: "In case of vacancy in the office of the Attorney General, or of his *absence* or disability, the Deputy Attorney General shall, pursuant to 28 U.S.C. § 508(a) perform the functions and duties of and act as the Attorney General." 28 C.F.R. § 0.132(a) (emphasis added). Unfortunately, neither the Act nor the Regulation define the word "absence."

The Government argues that on May 10, 1999, Attorney General Reno was legally absent, as contemplated by the Act and Regulation, because she was a few blocks away attending a conference at the White House. The Court finds this argument unconvincing because, if accepted, the implication would be that the Deputy Attorney General could act in the Attorney General's stead whenever she was *temporarily away from the office*, such as if she had gone to lunch or left for the evening. Surely such a result would be preposterous, especially, where as here the most fundamental right—the right to life—is at issue and contact with the Attorney General could have been easily established.[22] Furthermore, neither the parties nor this Court could find any cases where the word "absence" has been given such a broad construction. In fact, the only cases applying 28 U.S.C. § 508(a) have involved the Deputy Attorney General's or the Solicitor General's authority to act when the Attorney General *had resigned,* and was not merely temporarily out-of-pocket, as in this case. *See United States v. Pellicci,* 504 F.2d 1106 (1st Cir.1974), *cert. denied,* 419 U.S. 1122, 95 S.Ct. 805, 42 L.Ed.2d 821 (1975); *United States v. Halmo,* 386 F.Supp. 593 (E.D.Wis.1974); *United States v. Curreri,* 363 F.Supp. 430 (D.Md.1973). Accordingly, the Court concludes that Deputy Attorney General Holder did not have the authority to act in Attorney General Reno's stead on the theory that she was legally absent as contemplated by either 28 U.S.C. § 508(a) or 28 C.F.R. § 0.132.

■ Second, the Court concludes that Deputy Attorney General Holder did not have authority to act in Attorney General Reno's stead because the specific language of the Protocol provides that the final decision to decertify a death penalty notice must be made by the Attorney General personally. In support of this conclusion,

---

**22.** Defendant Lee offered to establish this theory through the testimony of Attorney General Reno and Deputy Attorney General Holder. However, because these subpoenas were quashed, no record could be made on the ease with which the Attorney General may have been contacted with regard to such a serious matter. Assuming this is not a matter of judicial notice, the Court must nevertheless assume that the Attorney General could have been easily contacted.

the Court turns to 28 C.F.R. § 0.15(a), which provides that: "The Deputy Attorney General is authorized to exercise all the power and authority of the Attorney General, *unless any such power or authority is required by law to be exercised by the Attorney General personally.*" (Emphasis added.) This same language can also be found in Section 1–2.102 of the U.S. Attorney's Manual. As previously mentioned, the Death Penalty Protocol unequivocally declares that "the *Attorney General* shall make the final decision" whether to decertify a death penalty notice. U.S. Attorney's Manual § 9–10.090 (emphasis added). The Government argues that Section 9–10.090 does not have the force of law as required by 28 C.F.R. § 0.15 and Section 1–2.102. This Court, however, has already held that pursuant to the *Accardi* doctrine, procedural statements found in the U.S. Attorney's Manual have the force of law if they affect an individual's rights. Here, it is clear that the Attorney General mandated by her own Protocol that she alone would make a final determination whether to withdraw a death penalty notice. Hence, Deputy Attorney General Holder had no right to usurp Attorney General Reno's clear reservation of exclusive authority merely because she was temporarily away from her office. Furthermore, it is clear that the Attorney General can revoke any general grant of authority to the Deputy Attorney General, and it appears that Attorney General Reno did exactly that when she promulgated Section 9–10.090, which unequivocally declares that she, personally, will make the final decision on a request to decertify a death penalty notice. So, assuming that before the promulgation of the Protocol the Deputy Attorney General had such general authority, it is clear that the Attorney General removed that general authority when she place the Protocol in effect.

For these reasons, this Court rules that Deputy Attorney General Holder did not have the authority, under the facts of this case, to make the final and substantive decision to deny the U.S. Attorney's request to decertify or withdraw the death penalty notice in Defendant Lee's case. Accordingly, the Court concludes that the Death Penalty Protocol was in fact violated in this case, and that Defendant Lee has a right to require the Attorney General and the DOJ to properly comply with the procedures established in the Protocol before the Attorney General makes the "final decision" to withdraw or not withdraw the death penalty notice. Therefore, the Court sets aside as a nullity Deputy Attorney General Holder's decision and remands the matter to Attorney General Reno for consideration pursuant to the procedures she has prescribed for herself in the Protocol. *See Walker,* 925 F.Supp. at 133.

## CONSEQUENCES OF COURT'S RULING

The Court must now determine the disposition of this case in light of the rulings entered herein on the future dangerousness and Protocol issues. The Court interprets its ruling on the Protocol issue as requiring the Government to "turn-the-clock-back" to that moment immediately after the Government announced its intention to seek the decertification of the death penalty notice. The Department of Justice and the Attorney General must then fully and properly comply with the procedural terms of the Death Penalty Protocol, to-wit: 1) the request to withdraw the death penalty notice will be reviewed by the Review Committee on Capital Cases; 2) the Committee will make its recommendation to Attorney General Reno; and 3) Attorney General Reno, *herself,* will then make the final decision whether to decertify or withdraw the death penalty notice as to Defendant Lee.

If the Attorney General decides to grant the U.S. Attorney's request to decertify the death penalty notice, this Court will impose the sentence of life without the possibility of release.[23] In contrast, if the

23. The Court heard, reviewed, and otherwise

experienced all of the evidence in the guilt

Attorney General decides not to decertify the death penalty notice, then both of the Court's rulings, i.e., its ruling on the Protocol issue and its ruling that it was error to introduce certain evidence of future dangerousness, will require that Defendant Lee be given a new penalty phase trial. A new jury will have to be selected for this purpose. Furthermore, a new penalty phase trial might require the presentation of most of the evidence introduced during the guilt phase of the trial because Defendant Lee contends that the jury should be made aware of Defendant Kehoe's greater and more culpable role in the RICO crimes which nevertheless resulted in Defendant Kehoe receiving a sentence of life imprisonment without the possibility of release. Of course, elaborate stipulations might shorten the trial to some degree. The Court will determine the specific procedures for conducting a new penalty phase trial if and when the occasion arises.

### CONCLUSION

IT IS THEREFORE ORDERED THAT the Department of Justice and the Attorney General be, and they are hereby, ordered to properly review and act upon the U.S. Attorney's request to decertify or withdraw the death penalty notice in Defendant Lee's case in accordance with the procedures mandated by the Death Penalty Protocol before the Attorney General, herself, makes the final decision whether to grant or deny that request.

IT IS THEREFORE FURTHER ORDERED THAT Defendant Lee's Motion for a New Penalty Phase Trial be, and it is, hereby GRANTED. Accordingly, if the Attorney General denies the request to decertify or withdraw the death penalty notice, then the Court will hold a new penalty phase trial for Defendant Lee. If the Attorney General grants the request to decertify or withdraw the death penalty notice, then the Order for a new penalty phase trial will be moot, and the Court will

phase of the trial. Assuming that it has, under the law, the discretion under such circumstances to impose some other penalty than life without the possibility of release

sentence Defendant Lee to life imprisonment without the possibility of release.

(such as life), the Court would nevertheless impose on Defendant Lee the sentence of life without the possibility of release.